| | | |
|---|---|---|
| BROCK C. LYONS, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | CAUSE NO.: 4:15-CV-17-PRC |
| | ) | |
| LEATT CORPORATION, | ) | |
|     Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on a Motion in Limine to Exclude Proposed Opinion Testimony by Tyler Kress, Ph.D. [DE 55], filed by Defendant Leatt Corporation on May 1, 2017; a Motion in Limine to Exclude Proposed Opinion Testimony by Ryan Hughes [DE 58], filed by Defendant on May 1, 2017; a Motion to Strike Declaration of Tyler Kress, Ph.D. [DE 74], filed by Defendant on May 19, 2017; and a Motion to Strike Affidavit of Ryan Hughes [DE 85], filed by Defendant on June 6, 2017. All motions were fully briefed as of June 9, 2017.

In his Amended Complaint, Plaintiff Brock Lyons alleges that he was injured on April 13, 2014, when the Moto GPX Sport Leatt-Brace, advertised, marketed, distributed, and promoted by Defendant Leatt Corporation, "caused and/or failed to protect Plaintiff from serious bodily injury" while Plaintiff used the brace in a reasonably foreseeable manner.

Count I is brought under the Indiana Products Liability Act, alleging that Defendant should be held strictly liable as a designer, manufacturer, distributor, and seller of the brace, which was in a defective condition and unreasonably dangerous to expected users such as Plaintiff. Count II alleges a claim of breach of warranty for failing to protect Plaintiff from serious bodily injury, alleging that Defendant made implied and express warranties that the brace was reasonably fit for the general uses and purposes intended and that it was free of any defects in its design or construction. Count III alleges that Defendant negligently designed, manufactured, marketed, and

distributed the brace in such a manner that it created an unreasonable risk of physical harm and injury and that Defendant failed to warn of the known and foreseeable hazard of the brace. Count IV alleges gross negligence and seeks punitive damages. On November 10, 2015, the Court dismissed Count V, which alleges deceptive and misleading advertising and marketing.

## I. ACCIDENT DESCRIPTION

On April 13, 2014, 28-year-old Plaintiff Brock Lyons was riding his 2013 Honda 450cc dirt bike on a Rossville, Indiana, track called Wildcat Creek MX. Plaintiff was practicing for a qualifying round of the Loretta Lynn National Amateur Competition. The weather was a typical spring morning, between 50 and 60 degrees Fahrenheit, and the track was in good condition. Plaintiff was familiar with the track's layout, having ridden the Wildcat Creek track close to a hundred times over the preceding ten years. He was wearing a motocross jersey and motocross boots, pants, gloves, and goggles as well as a full-face ATR-1 motocross helmet made by 6D and a 2007 Moto GPX Sport Leatt-Brace—a neck brace ("Leatt Brace"). Plaintiff had worn this Leatt Brace for seven years, from 2007 to 2014, and he had never "had a wreck" with his Leatt Brace before April 13, 2014. (ECF 59-1, pp. 141-42, 146).

That day, Plaintiff lost control and was thrown off the motorcycle as he was negotiating a step-up jump on the east side of the track. He testified that he went up the jump at about 40 mph but came back down "nose-high," i.e., touching down with the rear wheel only, with the front wheel in the air at a 55-degree angle to horizontal:

> I was trying to get the bike down and trying to get the bike down, and it just landed nose high. And when it did, it landed so hard on the rear that it threw me forward. When it landed, it slapped, and the front end came down, and I came over the front left of the handlebars.

(ECF 56, Ex. A, pp. 167-68). Plaintiff testified that it is not uncommon to land nose high, stating that "[w]e run into it quite often." *Id.* at p. 171. But, he testified that, on the day of the incident, "it slapped so hard it just sent me over the bars. I couldn't hold on." *Id.* at p. 172. Hurled forward, Plaintiff struck the ground head first, with the initial point of impact near the top of his helmet above the left eye. *Id.* at pp. 177-78. A fraction of a second after the impact, Plaintiff felt "everything go numb" and log-rolled down the grassy hill beside the track. *Id.* at pp. 173-74.

Plaintiff suffered a thoracic spinal cord injury, specifically "three-column" fractures at the thoracic vertebra at T5-T6. Ejected fragments of the shattered vertebrae nearly obliterated his spinal canal. Other injuries included "jumped facets" at T5-T6, spinal cord edema from T4 to T7, and intradural hematoma with cord compression extending down to T10. Plaintiff had no acute injury to either his brain or his neck.

Plaintiff alleges that the Leatt Brace is defective because it restricts a rider's range of motion while wearing the brace. (ECF 71, pp. 1-2).

Plaintiff timely disclosed Tyler Kress, Ph.D. and Ryan Hughes as expert witnesses in this case. In the instant motions, Defendant seeks to exclude the opinion testimony of both.

## II. MOTION TO STRIKE
## DECLARATION OF TYLER KRESS, PH.D.

In support of his response to Defendant's Motion in Limine to Exclude Proposed Opinion Testimony by Tyler Kress, Ph.D., Plaintiff attaches the May 15, 2017 Declaration of Dr. Kress, which was drafted for the purpose of responding to the Motion in Limine. In the instant Motion to Strike, Defendant argues that Dr. Kress' Declaration is a supplemental report aimed at remedying the deficiencies in Dr. Kress' original opinions identified by Defendant. Defendant argues that this

supplemental report should be stricken under Rule 37(c) as untimely for having been disclosed after Plaintiff's Rule 26(a)(2) disclosure deadline.

In the Motion to Strike, Defendant identifies only one "new" opinion by Dr. Kress in the May 15, 2017 Declaration: "I believe Brock Lyons had a much improved opportunity to avoid injury if he was not wearing the Leatt neck brace . . . ." (ECF 75, p. 4 (quoting (ECF 72, p. 5, ¶ 12))). Defendant contrasts this statement with the "original" opinion in Dr. Kress' November 4, 2016 Rule 26 report that "it would be more likely Brock would not have sustained the catastrophic spinal cord injury if he had not been wearing the brace." *Id*. (quoting (ECF 56-2, p. 10)). Defendant argues that these statements represent a different level of evidentiary proof. *See id*. However, a cursory comparison of Dr. Kress' Declaration and Dr. Kress' original Rule 26 report show that both the "new" and "original" opinions are in both documents. *Compare* (ECF 72, p. 5, ¶ 12), *with* (ECF 56-2, p. 9); *compare* (ECF 72, p. 5, ¶ 11), *with* (ECF 56-2, p. 10); *see also* (ECF 72, p. 5, ¶ 11) (Dr. Kress' Declaration citing the original Rule 26 report). To the extent Defendant raises other specific purported inconsistencies for the first time in its reply brief, such as the nature of Dr. Kress' doctoral degree, any such argument is waived as untimely. *See* (ECF 84, p. 2).

Based on the arguments raised by Defendant, the Court denies the Motion to Strike Dr. Kress' Declaration. The Court nevertheless weighs the import of Dr. Kress' Declaration in light of his original Rule 26 report and the arguments and case law in the parties' briefs on the Motion in Limine. Specifically, the explanation in paragraph 12 of the Declaration setting forth why Dr. Kress believes that a limitation in range of motion in the neck and head causes axial forces to increase in the spine based on Newton's law and the axial and bending forces of the spine was not included in

either his original report or his deposition and, thus, is untimely and will not be considered. *See* (ECF 72, pp. 5-6, ¶ 12).

## III. MOTION IN LIMINE TO EXCLUDE
## PROPOSED OPINION TESTIMONY BY TYLER KRESS, PH.D.

Defendant Leatt Corporation asks the Court to exclude the expert opinion testimony of Tyler Kress, Ph.D., offered by Plaintiff Brock C. Lyons. Defendant argues that, because Dr. Kress ignored the requirements of Federal Rule of Civil Procedure 26(a)(2)(B), his report should be excluded under the mandatory exclusion provisions of Federal Rule of Civil Procedure 37(c). In addition, Defendant argues that Dr. Kress' report and his discovery deposition demonstrate that his opinions do not meet the admissibility criteria of Federal Rule of Evidence 702 and *Daubert* or the foundational requirements of Federal Rule of Evidence 703. For the reasons set forth below, the Court finds that Dr. Kress' report and opinions must be excluded under Federal Rule of Civil Procedure 37(c) and that his opinions are not admissible under Federal Rule of Evidence 702 and *Daubert*.

### A. Dr. Kress' Opinions

On November 4, 2016, Dr. Kress authored a 27-page expert report setting forth his "opinions regarding a sports injury accident that occurred on April 13, 2014, involving a single off-road motorcycle," namely the April 13, 2014 injury to Plaintiff underlying the instant lawsuit. *See* (ECF 56-2, p. 1).

In the Introduction, Dr. Kress writes, "Unfortunately, as you are well aware, April 13, 2014, was unique and different from his past experiences in that [Brock] was wearing the Leatt-Brace™ (herein referred to as the Leatt brace). The Leatt brace introduced devastating biomechanical constraints, i.e restricting Brock's head's range of motion (ROM) *and* increasing spinal loading, ultimately resulting in an otherwise avoidable spinal cord compromise." *Id.* (emphasis added).

Dr. Kress then sets forth his "Qualifications/Experience, Case List, and Fees." *Id*. at pp. 1-2.

The next section of the report is titled, "Material Reviewed/Basis for Findings/Opinions," which provides, "In accord with your request, I have reviewed available case material including the following[.]" *Id*. at p. 2. The list of materials reviewed spans seven pages. Then, on page 9 of the report, the last subsection titled "Findings/Opinions" provides:

> **Findings/Opinions**: The intent of this report is to succinctly state my findings/opinions and the basis thereof. As stated previously, I would like to reserve the right to possibly supplement this report if allowed by the court as discovery proceeds and if further work is performed.
>
> The following bullets represent key axioms associated with "product safety management". Generally speaking, all of the below axioms are the responsibilities of a prudent manufacturer of a product.
>
> - *In so far as possible, foreseeable hazards will be reduced to acceptable levels through the design process.*
> - *Hazards that cannot be "designed away" will be appropriately guarded against.*
> - *The production process will have appropriate manufacturing facilities and have QA/QC methods to assure that the product meets the design specifications.*
> - *Products will be tested to validate their safety status. Improvements will be made through design iteration.*
> - *Users will have appropriate manuals, training, qualification, and necessary warnings so that they understand the hazards and are knowledgeable users.*
> - *The actual use experience will be monitored and feedback obtained to permit possible improvements in safety, design, production, warnings, and manuals.*
>
> 1. Foreseeable hazards were not appropriately addressed in the design of the subject product. The intent of the subject product (as you know) is to be "protective" against *spinal injuries*, yet it fails to protect against well-known key catastrophic mechanisms of spinal injury. In fact, fundamental biomechanics indicates that the design markedly reduces a *person's natural ability to avoid/mitigate axial loading and bending moments imparted onto the spine*. It is clear that Leatt has applied a "point design" approach mentality to its product with a focus on preventing neck "bending-type" of injuries (e.g. flexion and extension related). Attention has been paid to restricting head motion with the design criteria of reducing potential for

hyper-flexion- and hyper-extension type injuries at the expense of increasing and exacerbating risk of other mechanisms of injury. Leatt's design inappropriately restricts an individual's natural movement and their own ability to "tuck-and roll" their head and use normal motions and/or their skills to manage the dynamics, kinematics, and biomechanics of impact. While experiencing a "head first lawn dart" type of scenario (using Leatt's words), the Leatt brace constrains the neck from hyperextension movement posteriorly and also hyperflexion anteriorly via constraining the head. This increases the potential *axial loading* component imparted to the spine which adversely alters the subsequent forces/moments within the *cervical spine*. The human head needs to be able to avoid/minimize impact by using its full range of motion and should not be forced into an orientation of the head/spine such that the spine and neck are more vulnerable to vertebral body fractures, retropulsion, compression and catastrophic injury. Brock received serious *thoracic* injury consistent with the deficiencies of the brace design, and he had a much improved opportunity to avoid such injury had he not been wearing the Leatt brace.

2. After thorough review of the available materials, it is my opinion that Leatt did not adequately rely upon reasonable engineering analysis, testing, and/or literature to validate the safety status of their brace. Certainly, their communications and literature made claims that were not appropriate with respect to its safety claims. Leatt did not adequately address the safety status/claims of their device through dynamic testing, appropriate risk assessment, fault tree analysis, and/or other means. The design did not adequately address hazards that can be identified through proper analysis and through knowledge of previous incidents.

3. The rigidity (i.e. non-frangibility) of the Leatt brace and the existence of the anterior ROM constraint are two primary problems with the device. My review of the available materials in this matter, coupled with knowledge of the field of injury biomechanics, yields the opinion that there is no reasonable scientific basis to infer that, for catastrophic injuries often experienced by motocross riders, stopping/restricting the ROM of the head (the way in which the Leatt brace does) reduces overall injury risk. In fact, it is more reasonable to conclude that serious injury risk is increased while possibly reducing some less serious and more minor injury modes. With respect to the experiments at Virginia Tech that I conducted, the resultant measured accelerations and forces that were imparted onto the test dummy were extremely similar for the two different conditions, i.e. "with" the Leatt brace as compared to "without". *Under the test conditions performed the use of the Leatt brace does not have a considerable effect on spinal column loading.* This includes reducing neck compressive/axial loading.

4. The angular head acceleration, upper lateral neck moment and the lower anterior-to posterior neck force were the only measured values that were slightly lower for the tests "with" the Leatt brace. However, the differences in these measurements are relatively small and unrelated to the catastrophic injury modes for

motorcross[1] riders. A soft tissue "stinger" type of injury risk may be reduced, yet a major injury risk such as that which was sustained by Brock, would not be reduced. In fact, it would be more likely Brock would not have sustained the catastrophic spinal cord injury if he had not been wearing the Leatt brace.

5. Devastating biomechanical constraints are introduced by the use of the Leatt brace. Leatt's design inappropriately restricts movement of the head about the torso and one's ability to "tuck-and-roll" and use skills to manage the dynamics, kinematics, and biomechanics of impact. *Limiting the range of motion of a motorcross rider's head with a neck brace increases and focuses compressive loads onto the vertebrae.*

6. Motorcross riders are better off not wearing the brace from an overall safety and injury perspective. Reasonable consideration of proper engineering design, biomechanical considerations, and testing results should have led Leatt to conclude that any benefits that may be derived from potential reduction of certain injuries by use of their brace did not outweigh the trade-off of introducing an increased risk of the most serious injury modes of the spine.

*Id*. at pp. 9-10 (emphasis added).

The remainder of the report contains a signature page, *see id*. at p. 11; Dr. Kress' summary of highlights from Plaintiff's August 18, 2016 deposition, *see id*. at pp. 12-20; and Dr. Kress' summary of Plaintiff's "Medical Record Highlights," *see id*. at pp. 21-27. Dr. Kress also submitted his curriculum vitae, *see id*. at pp. 28-40, and his four-year case list, *see id*. at pp. 41-43.[2]

Defendant took Dr. Kress' discovery deposition on February 2, 2017.

## B. Federal Rule of Civil Procedure 26

Federal Rule of Civil Procedure 26(a)(2)(B) requires that a retained expert witness provide a written report containing:

---

[1] Throughout his report, Dr. Kress refers to the sport of motocross as both "motocross" and "motorcross."

[2] In filing the instant Motion in Limine on the electronic docket, Defendant appended the exhibits from Dr. Kress' deposition to Dr. Kress' Rule 26 report, *see* (ECF 56-2), rather than to the transcript of Dr. Kress' deposition, *see* (ECF 56-3).

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B)(i)-(vi).

The expert's report "must include the 'how' and 'why' the expert reached a particular result, and not merely the expert's conclusory opinions." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)). The "primary goal" of Rule 26(a)(2) is "to shorten or decrease the need for expert depositions." *Ciomber*, 527 F.3d at 642 (quoting *Salgado*, 150 F.3d at 741 n.6).

Federal Rule of Civil Procedure 37(c)(1) mandates that, if a party fails to provide information or identify a witness as required by Rule 26(a), "the party is not allowed to use that information or witness . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Ciomber*, 527 F.3d at 642 (citing *Jenkins v. Bartlett*, 487 F.3d 482, 487 (7th Cir. 2007)). This is a self-executing sanction that is automatic and mandatory. *See* Fed. R. Civ. P. 37 advisory committee's note to 1993 amendment ("[Rule 37(c)(1)] provides a self-executing sanction for failure to make a disclosure required by Rule 26(a) . . . ."); *Ciomber*, 527 F.3d at 642. Although the Court does not need to make specific findings concerning substantial justification or harmlessness, four factors guide the Court's determination of whether noncompliance with Rule 26(a) is harmless: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or

willingness involved in not disclosing the evidence at an earlier date. *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (quoting *David v. Caterpillar*, 324 F.3d 851, 857 (7th Cir. 2003)). A party may not argue that a deficiency is harmless on the ground that a subsequent deposition could cure any prejudice. *Ciomber*, 527 F.3d at 642.

Dr. Kress timely tendered a report pursuant to Rule 26(a)(2)(B), in which he set forth his opinions, his qualifications, a list of his publications, his four-year case list, and a statement of his compensation. *See* Fed. R. Civ. P. 26(a)(2)(B)(i), (iii)-(vi). However, Defendant argues that Dr. Kress' report should be excluded under Rule 37(c)(1) for failing to include a complete statement of the basis and reasons for his opinions and for failing to include the facts or data he considered in forming his opinions. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). Plaintiff responds that Dr. Kress' report is complete and in compliance with Rule 26 and that the failure to include certain information, such as photographs, is harmless.

The Court finds that, despite its compliance with the other requirements of Rule 26(a)(2)(B), Dr. Kress' report fails to set forth the reasons for his opinions and the facts or data he considered in forming his opinions. Because the omissions are not substantially justified or harmless, the report is excluded as a sanction. The Court considers each of Defendant's arguments in turn.

1.    *Surrogate Study and Photographs*

First, Dr. Kress' report did not disclose the fact that Dr. Kress conducted a biomechanical "surrogate study" using Plaintiff, the measurements or data generated from the study, or approximately 270 photographs, some of which were of the study. As described by Dr. Kress at his deposition, surrogate studies are one of the tools employed by biomechanical engineers to understand the interaction between a person and a product. (ECF 56-3, p. 23). In this instance, Dr.

Kress did not use a "surrogate" but rather used Plaintiff himself as a model for the study, taking "range of motion" measurements and photographs of Plaintiff wearing the Leatt Brace and his helmet: "[Y]ou can't get a better surrogate in this matter than him, where I put the equipment on him and took numerous measurements to help understand those biomechanics." (ECF 56-3, p. 24). Also, Dr. Kress testified that he took approximately 270 photographs of the accident scene as well as during the undisclosed study of Plaintiff. (ECF 56-3, pp. 25-26, 31-32). Dr. Kress describes these photographs as "showing the spacing between the brace and the helmet." (ECF 56-3, p. 86).

Yet, there is no reference due in his Rule 26 report to the study, the measurements, an analysis of the measurements, the photographs, or how the study supports his opinions. (ECF 56-3, pp. 25-27, 86). It was not until his deposition that Dr. Kress revealed that he had done a biomechanical reconstruction of the accident by assessing the ergonomics of Plaintiff wearing both his helmet and the Leatt Brace. (ECF 56-3, p. 7, 23, 25-26). This is troubling because the premise of Dr. Kress' opinion is that Plaintiff's range of motion was restricted by the Leatt Brace, preventing him from doing a "tuck and roll" that allegedly would have permitted him to avoid landing head first and avoid axial loading sufficient to injure his thoracic spine. Dr. Kress testified that this opinion is based, along with speaking with Plaintiff, on this study. (ECF 56-3, pp. 84-86).

The failure to disclose the study and its measurements and data is not harmless. Plaintiff's expert witness disclosures were due November 25, 2016, and Defendant's expert witness disclosures were due January 27, 2017. The parties met those deadlines. Because Dr. Kress' report omitted the fact of the study, the data, the photos, and any analysis thereof, Defendant's experts did not have the benefit of the basis of Dr. Kress' opinion in forming their own opinions and Defendant's counsel found himself conducting Dr. Kress' deposition without knowing a critical basis of Dr. Kress'

testimony. *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000) ("The expert witness discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case."); *see also Ciomber*, 527 F.3d at 642. In other words, Defendant was "ambushed" with this information at Dr. Kress' deposition. *Kirkland v. Sigalove*, No. 11 C 7285, 2015 WL 523673, at *4-5 (N.D. Ill. Feb. 6, 2015).

Rule 26(a)(2) "does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony." *Ciomber*, 527 F.3d at 642 (citing *Sherrod*, 223 F.3d at 613; *Salgado*, 150 F.3d at 741 n. 6). Plaintiff cannot cure Dr. Kress' deficient report with his deposition testimony or the untimely disclosure of his notes at the time of his deposition. *Id*. Yet, even at his deposition, Dr. Kress did not identify any specific measurements, calculations, or analysis showing how or to what extent the Leatt Brace reduced Plaintiff's range of motion or showing how a limitation in the range of motion affected Plaintiff's ability to tuck and roll.

Similarly, Dr. Kress testified that, in his file, he has snapshots of video and testing done by Leatt Corporation showing the limited range of motion, the helmet and brace space, and where the helmet comes in contact with the brace, namely the Leatt Test KSKF 26A and Test KSKF 25A. (ECF 56-3, pp. 85-86, 89, 90). However, Dr. Kress did not identify Test KSKF 26A or Test KSKF 25A in his report. (ECF 56-3, pp. 89-90). As with his own "surrogate study" using Plaintiff, Dr. Leatt did not identify in his report these *Leatt* tests or the data from those tests that he asserts support his opinion. (ECF 56-3, p. 91). Instead, his report references generally testing with and without the brace with no supporting data or analysis. (ECF 56-3, p. 93).

Plaintiff argues that the failure to disclose the "surrogate study" along with its measurements, data, and photographs is harmless because Dr. Kress stated in his report, "I have interviewed [Plaintiff] as part of my efforts in this matter," (ECF 56-3, p. 8), suggesting that Defendant should have understood from this statement that photographs were taken. This argument is unavailing. The representation that Dr. Kress interviewed Plaintiff is not a substitute for the disclosure of a study, the data from the study, the analysis and conclusions drawn from the study, and the existence of photographs taken as part of the study. Likewise, the fact that, during his earlier August 18, 2016 deposition, Plaintiff testified that measurements were taken by Dr. Kress does not change the requirement that Dr. Kress include the data and analysis in his Rule 26 report if he relied on them in forming his opinions. The burden is on Plaintiff's expert to disclose in his report, and not on Defendant to seek, the basis for and the data and facts relied upon in forming his opinions.

Plaintiff also argues that Defendant should not be surprised that Dr. Kress took photos and measurements because Dr. Kress did something similar in a prior, separate litigation. But, Plaintiff bases this argument on the mistaken belief that counsel for Defendant in this case represented Defendant in that similar case—*Keith Guiden v. Leatt Corporation*. *See* (ECF 56-3, p. 126) (Dr. Kress' dep.); (ECF 73-2) (*Guiden v. Leatt Corp.* docket sheet). Regardless, Dr. Kress had an obligation to include in his report the data and facts relied upon in forming his opinion.

In his response brief, Plaintiff quotes *Salgado v. General Motors Corp.* for its reference to the Rule 26 advisory committee note that "[a] complete report must contain the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor." 150 F.3d at 742 n.6. The footnote in *Salgado* then provides (not cited by Plaintiff), that "[t]he report must be complete such that opposing counsel is not forced to depose an expert in order

to avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *Id.* In *Salgado*, the Seventh Circuit Court of Appeals affirmed the district court's exclusion of the expert because the Rule 26 report was insufficient in part because it was "devoid of any factual basis for its conclusory opinions," *id.* at 738, and affirmed the finding that the failure to comply with Rule 26 was not harmless, *id.* at 742. Specifically, the court wrote: "No matter what GM's experience with this issue or with Salgado's counsel may have been in the past . . . , GM had a right to know the conclusions of these particular expert witnesses with respect to this particular accident." *Id.* at 742. The instant case is no different. Defendant had a right to know the factual basis for Dr. Kress' opinion in this case related to this Plaintiff, regardless of prior litigation.

Dr. Kress' report is insufficient because it does not contain the factual basis for its conclusory opinions, and the failure to comply was not harmless.

2.      *The Work of Grant Nelson*

In his Rule 26 report, Dr. Kress lists the "deposition transcript" of "Grant Nelson—former engineer for Leatt" as a material reviewed. *See* (ECF 56-2, p. 7). Thus, Defendant made a written request for the Nelson deposition transcript in November 2016. However, the Nelson deposition transcript was never produced prior to Dr. Kress' deposition in February 2017.

At his deposition, Dr. Kress testified that his opinion relies in part on work performed by Grant Nelson, a former Leatt Corporation employee, to show "how the thoracic loads are increased due to this particular design." (ECF 56-3, p. 77). Dr. Kress testified that he read a deposition of Nelson taken in a different litigation in which Nelson purportedly said there was an increase in forces in the thoracic spine caused by wearing the brace during an incident. *Id.* at pp. 78-79. Yet,

14

Dr. Kress also testified that he cannot recall ever seeing any scientific study or report authored by Nelson that contains data or testing that supports Dr. Kress' theory in this case. (ECF 56-3, pp. 80-81). If there were facts and data from reports authored by Nelson that Dr. Kress relied on in forming his opinions in this case, those facts and data should have been included in Dr. Kress' report in this case. Moreover, Dr. Kress apparently based his opinion on these statements made by Grant Nelson without having reviewed the scientific basis for Nelson's statements, which goes to the reliability of Dr. Kress' opinion. *See infra* Part III.C (discussing Federal Rules of Evidence 702 and 703 and *Daubert*).

Plaintiff responds that Nelson was not a "standard employee, but was a principle research[sic] and designer of the brace." (ECF 71, p. 9). Plaintiff's counsel then makes the unsupported statement: "Of particular note is that Grant Nelson's testing and review indicated that the brace does increase forces and that this information was relayed to Dr. Chris Leatt." *Id*. Inexplicably, Plaintiff offers no citation for this statement. Plaintiff neither quotes from a deposition of Nelson making this statement, attaches a transcript of Nelson's purported deposition, nor offers evidence of data or testing done by Nelson in support of this alleged statement. The Court disregards counsel's statement regarding the substance of Nelson's purported deposition testimony.

Thus, as with the surrogate study and the Leatt studies, Dr. Kress based his opinion in this case on statements made by Grant Nelson in a deposition in separate litigation without having reviewed the basis for Nelson's statements and without including Dr. Nelson's data in his report. This omission is prejudicial and not harmless to Defendant because Defendant's experts were unable to review this data and analysis before giving their opinions.

*3.     Methodology for Reaching Findings/Opinions*

Finally, Defendant argues that the most egregious omission from Dr. Kress' Rule 26 report is the failure to describe how Dr. Kress reached his "Findings/Opinions." The Court agrees.

When asked at his deposition to indicate where in his report he performed a biomechanical reconstruction of Plaintiff's accident, Dr. Kress could not identify any portion of his report that set out the data from such a reconstruction that formed the basis of his opinion. (ECF 56-3, pp. 7-12). Rather, Dr. Kress referenced file documents that he brought with him to his deposition that he had not previously disclosed. *Id*. at p. 8.

Dr. Kress explained: "But I would point to a lot of the foundation of that—nature of that opinion would be found as far as material reviewed and basis for those findings/opinion in that section that is actually called Material Reviewed/Basis for Findings and Opinions. That starts on page 2 and ends on page 9." (ECF 56-3, p. 8). Similarly, in his response brief, Plaintiff references these pages as demonstrating Dr. Kress' methodology. However, pages 2 through 9 of the report contain only a list of the materials Dr. Kress reviewed; they do not contain a description of any reconstruction of Plaintiff's accident or a description of the process, method, or theory Dr. Kress used to generate his conclusions regarding the cause of Plaintiff's thoracic injuries. Yet, Dr. Kress testified that pages 2 through 9 are "the best place to characterize my methodology . . . as succinctly and as organized as I can." (ECF 56-3, pp. 19-20). In his response brief, Plaintiff does not identify any statements in Dr. Kress' report articulating how he arrived at his opinions based on the listed materials. Dr. Kress' report fails to provide the "how and why" he reached his result and, thus, falls short of the requirements of Rule 26. *Ciomber*, 527 F.3d at 641 (quoting *Salgado*, 150 F.3d at 741 n.6).

This prejudice to Defendant is not harmless in light of the timing of the parties' expert witness exchanges, detailed above. Therefore, when Dr. Kress (Plaintiff's expert) testified on February 2, 2017, about the studies and data omitted from his report, Plaintiff was already in possession of Defendant's expert witness disclosures. Yet, Defendant's experts had neither seen nor been able to test the data and methodology of Plaintiff's earlier-disclosed expert.

Again, Plaintiff's citation to case law is curious. Plaintiff cites *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), for the quotation, "[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data." However, Plaintiff omits the following sentence in *Joiner*: "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. As discussed more thoroughly below in Part III.C in the context of Rule of Evidence 702 and *Daubert*, Dr. Kress' opinion is connected to the underlying materials only by his *ipse dixit*—his say-so.

Plaintiff represents, without citation to any record, that Dr. Kress has acquired a large library of research and literature, has a great deal of personal experience, and has been retained to testify in many cases regarding the Leatt neck brace. (ECF 71, p. 12). While these statements may be true, they do not fill in the analytical gap in Dr. Kress' Rule 26 report.[3]

---

[3] Plaintiff cites *Bunch v. State*, 964 N.E.2d 274, 295 (Ind. Ct. App. 2012), which is an Indiana Court of Appeals case. However, in his brief, Plaintiff inaccurately attributes the case to the Seventh Circuit Court of Appeals "(7th Cir. 2012)" rather than the Indiana Court of Appeals. *See* (ECF 71, p. 12).

*4.    Rule 37(c)(1) Sanctions*

Plaintiff's violation of Rule 26(a) was neither substantially justified nor harmless because of the prejudice to Defendant. The prejudice and surprise to Defendant cannot be cured given the timing of expert disclosures. *See David*, 324 F.3d at 857; *see also Kirkland*, 2015 WL 523673, at *7. As a result, Dr. Kress' report and opinions are excluded. *See* Fed. R. Civ. P. 37(c)(1).

## C. Federal Rules of Evidence 702 and 703 and *Daubert*

Separate from the exclusion under Rule 37(c)(1), Dr. Kress' opinions are inadmissible pursuant to Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which govern the admissibility of expert testimony. *See United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
**(b)** the testimony is based on sufficient facts or data;
**(c)** the testimony is the product of reliable principles and methods; and
**(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702 and *Daubert*, district courts engage in a three-step inquiry to determine the admissibility of proffered expert testimony, asking whether (1) "the witness is qualified," (2) "the expert's methodology is scientifically reliable," and (3) "the testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)).

District courts serve a "gatekeeping" function to ensure that expert testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). "The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152). When determining the reliability of a qualified expert's testimony under *Daubert*, courts consider, among other things: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; (4) whether standards and controls exist and were maintained; and (5) whether the theory has been accepted in the relevant scientific community. *United States v. Lewisby*, 843 F.3d 653, 659 (7th Cir. 2016) (citing *Daubert*, 509 U.S. at 593-94). "[N]o single factor is either required in the analysis or dispositive as to its outcome." *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)).

"A court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. Even '[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Smith*, 215 F.3d at 718 (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)). The *Daubert* analysis applies to all expert testimony under Rule 702, not just scientific testimony. *Kumho Tire Co.*, 526 U.S. at 147.

Federal Rule of Evidence 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. In

addition, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id*.

As noted above in the Rule 26 analysis, the United States Supreme Court has upheld the exclusion of expert testimony that the district court found "did not rise above subjective belief or unsupported speculation," reasoning that "[t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 140, 146 (1997).

Dr. Kress opines in his report that wearing the Leatt Brace "increases spinal loading" in the event of an accident because the neck brace limits the wearer's range of motion, which in turn causes "devastating biomechanical constraints," preventing the wearer from performing a "tuck and roll" to "manage the dynamics, kinematics, and biomechanics of impact," which in turn "increases and focuses compressive loads onto the vertebrae." (ECF 56-2, p. 10, opinion paragraph 4). Defendant argues that Dr. Kress' opinions should be excluded under Rule 702 because of insufficient facts or data, unreliable methods, and a failure to account for obvious alternative explanations. The Court addresses each argument in turn.

1.      *Sufficiency of the Facts and Data*

First, as set forth in detail in the Rule 26 analysis in Part III.B above, Dr. Kress did not include in his report the facts, data, and calculations upon which he relied in forming his opinions.

Second, eight of the eleven pages of Dr. Kress' written report is a list of "Materials Reviewed/Basis for Findings/Opinions." The first two dozen of the items appear to be related to this

litigation. *See* (ECF 56-2, p. 2-3). The remaining materials are from separate lawsuits such as *Guiden v. Leatt Corp.*, *Maddock v. Leatt*, *Kemmer v. Leatt Corp.*, and *Tarrant v. Leatt*. Thus, Dr. Kress appears to rely heavily on materials from other lawsuits brought by different plaintiffs, yet offers no analysis of how those lawsuits are similar to the instant lawsuit and includes no data or facts from the biomechanical analyses in those lawsuits. Dr. Kress does not explain why or how the hearsay communications from witnesses in other lawsuits who were not disclosed in this case and who were supplied to him by unidentified individuals, would or should be information on which an expert would reasonably rely in accordance with Rule703. *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002); *In re James Wilson Assocs.*, 965 F.2d 160, 172-73 (7th Cir. 1992); *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015) ("This approach is not the stuff of science. It is based on faith in his fellow physicians—nothing more."). Plaintiff's response brief does not offer anything more substantive, asserting generally: "Here, the other accidents are similar in nature and quite useful to the experts in analyzing the defective design of the subject neck brace. All other accidents mentioned involve unrestrained, dirt bike riders, wearing a Leatt neck brace and suffering serious injuries to their spines." (ECF 71, p. 11).

Third, Dr. Kress stated in his Rule 26 report that "April 13, 2014 was unique and different from his past experiences in that [Plaintiff] was wearing the Leatt-Brace," bringing into question the accuracy of the information upon which he relied. (ECF 56-2, p. 1). Plaintiff testified that he wore his Leatt-Brace for seven years, from 2007 to 2014, but that he had never "had a wreck" with his Leatt Brace before the incident at issue in this case. (ECF 59-1, pp. 141-42, 146). Yet, in the previous paragraph of his report, Dr. Kress wrote:

> As is common in motocross, [Plaintiff] "wrecked" and specifically mislanded while riding his motorcycle (herein referred to as his bike) over mounds. He had

experienced similar dynamics and separation from his bike previously throughout his riding years. He was skilled at handling such incidents and had developed his natural abilities in avoiding and mitigating injuries from substantially similar body contact with the ground after a wreck.

(ECF 56-2, p. 1). Dr. Kress based his opinion in part on the erroneous belief that Plaintiff did not normally wear his brace and had previously experienced similar falls without a brace, when in fact Plaintiff had worn the Leatt Brace consistently for seven years. *See* (ECF 56-3, pp. 188-89, 192).

2.    *Dr. Kress' Methods*

First, Dr. Kress does not articulate what method he used to arrive at his opinions other than drawing conclusions based on his years of knowledge and experience and on the materials he reviewed. As noted in the previous section and in the Rule 26 analysis above, Dr. Kress did not identify the specific data on which he based his opinion. Thus, Dr. Kress is not extrapolating from existing data. *See Joiner*, 522 U.S. at 146. Dr. Kress has not specifically identified any mathematical equation, principle of physics or biomechanics, formula, or test results that support his hypothesis regarding the effect of wearing the Leatt Brace on the thoracic spine during an incident such as the one that Plaintiff experienced. *Compare Lapsley*, 689 F.3d at 808 (affirming the district court's finding that the expert's testimony did not lack a scientific basis because he relied on "commonly known methodologies and physics calculations," including Bernoulli's equation regarding energy in moving fluids and reference to "widely accepted factors concerning the force necessary to penetrate human skin").

Second, Dr. Kress did not rely on published or peer-reviewed work by others: "I did not take on[sic] effort in my report to go through a literature review and pick out articles that I felt like were supportive of my opinion." (ECF 56-2, pp. 55-56). He explains, "And the reason why is because I have a knowledge base based on decades of work, review of thousands of articles and teaching the

subjects." *Id*. at 56. This amounts to the *ipse dixit* testimony condemned by the Supreme Court in *Joiner. See Joiner*, 522 U.S. at 146.

Third, when asked about the variables that affect the axial load on the human spine in a head-first impact, Dr. Kress testified, "[T]here's some complex forces at play and that they are different types of forces, like compression, shear, torsional, bending. And the vector of the input influences that certainly and influences their distribution and which ones are higher in magnitude and which ones are more significant or not." (ECF 56-3, pp. 118-19). But Dr. Kress offers no facts, data, calculations, or analysis to show how the forces at play (compression, shear, torsional, bending ) and the vector of the input under the circumstances of Plaintiff's accident could lead to the conclusion that the Leatt Brace caused Plaintiff's injuries by restricting his range of motion and preventing him from performing a tuck and roll that would have avoided his injuries. *See* (ECF 56-3, pp. 120-21).

In fact, Dr. Kress' report itself does not include the fact that Plaintiff landed head first, *see* (ECF 56-3, pp. 116); this fact is only contained in the appendix of Dr. Kress' summary of Plaintiff's testimony, *see* (ECF 56-2, p. 12). In his report, Dr. Kress does not discuss the position of the helmet and the brace at impact. (ECF 56-3, p. 120). There is no scientific explanation of any interaction between the helmet and the brace. *Id*. at p. 121. In his deposition, Dr. Kress offers no specifics, referring only generally to the reports that he reviewed. In his deposition, Dr. Kress could not identify any data or testing showing that any restriction of movement caused by the Leatt Brace would cause the forces necessary to cause Plaintiff's injury or that the restriction of movement prevented Plaintiff from avoiding the impact at the angle at which it occurred. *Id*. at p. 125.

Fourth, Dr. Kress was asked at his deposition to identify where in his report he translated Plaintiff's recitation of what happened regarding his inability to tuck and roll into a scientific

explanation. Initially, Dr. Kress references his statement in opinion paragraph 1 that Plaintiff "received his serious thoracic injuries consistent with those deficiencies in the brace design." (ECF 56-3, p. 121); *see also* (ECF 56-2, p. 9). Dr. Kress then stated, "Well, the proof of my report is the test reports and testing that I've done and that I've -I mention in my report." (ECF 56-3, p. 123). Dr. Kress then references the "surrogate studies" as a basis for his opinions. However, as noted in the Rule 26 discussion above, Dr. Kress neither includes nor analyzes the data from any surrogate study, the study he conducted of Plaintiff himself, or any testing done in other litigation.

The only testing specifically identified in his report is a general reference to the "experiments at Virginia Tech":

> With respect to the experiments at Virginia Tech that I conducted, the resultant measured accelerations and forces that were imparted onto the test dummy were extremely similar for the two different conditions, i.e. "with" the Leatt brace as compared to "without". Under the test conditions performed the use of the Leatt brace does not have a considerable effect on spinal column loading. This includes reducing neck compressive/axial loading.

(ECF 56-2, p. 1, opinion paragraph 3). However, Dr. Kress' report does not disclose or use data generated by that Virginia Tech testing, does not explain that the testing was done in relation to the *Guiden v. Leatt Corporation* litigation, and does not include any data from the injury in the *Guiden* case. *See* (ECF 56-3, p. 145). On December 6, 2016, Defendant made a written request for the "entirety of the data, notes, pictures, and work product from the testing Dr. Kress mentions being conducted at Virginia Tech in 2012." (ECF 56-4, p. 2). The 2012 Virginia Tech report was given to Defendant the day before Dr. Kress' February 2, 2017 deposition. *See* (ECF 56-5).

Although the 2012 Virginia Tech testing by Dr. Kress and his colleagues was not for the purpose of understanding Plaintiff's mechanism of injury, the testing is highly relevant. Guiden was wearing a Leatt Brace and a helmet at the time of his motocross accident and injury. (ECF 56-3, p.

138). While riding his motorcycle, Guiden had an estimated forward velocity of 30-35 mph when leaving the first jump and a peak vertical height of four to six feet above the top of the second jump. (ECF 56-5, p. 1). Guiden landed on the apex of the second jump, resulting in the loss of forward velocity of the motorcycle, his forward momentum carrying him over the handle bars, and his first impact with the ground occurring on the front, top, right portion of the helmet. *Id.* Guiden's legs rotated over his head, and he sustained a number of lateral process fractures in the thoracic spine with the most serious injury a T6 burst fracture. *Id.*; *see also* (ECF 56-3, p. 137). The Virginia Tech test conditions were designed to mirror Guiden's accident. (ECF 56-3, p. 137, 138); *see also* (ECF 56-5, p.1). Although Dr. Kress' report does not include any data for Plaintiff's accident regarding the estimated height of the fall, the estimated impact velocity, or the estimated impact angle, Dr. Kress believes that the data for Plaintiff is "very similar" to that of the Virginia Tech test. (ECF 56-3, pp. 45, 138-40, 146).

The Virginia Tech test used a Hybrid III anthropomorphic test dummy equipped with a variety of sensors to record acceleration of the head, bending of the neck, and forces imparted to the spine. (ECF 56-5, p. 4). The dummy was fitted with a full face helmet, positioned in front of an impact piston, and struck in the top front right portion of the helmet to recreate a head-first impact. *Id.* at p. 4. The test recreated a mirror reflection of Plaintiff's impact on the front, top, left of his helmet. Dr. Kress testified that Plaintiff is very similar in height and weight to the test dummy. (ECF 56-3, p. 146). To assess the difference created by wearing a Leatt Brace during a high-force, head-first impact and to do "comparisons of constraints and performance," two tests were run with a Leatt Brace and two tests were run without the brace. (ECF 56-3, p. 138); (ECF 56-5, p. 2).

At his deposition, Dr. Kress was asked, "[W]hat do these data tell you about the creation of or transfer of forces to the thoracic spine of the dummy during your testing?" (ECF 56-3, p. 160). He responded, "[T]he acceleration and forces for the brace versus the no brace are extremely similar, basically less than five percent variation for most all pieces of data. And, you know, certainly that's within experimental variation." (ECF 56-3, p. 160). Thus, the Virginia Tech testing showed no increase in the transfer of forces to the thoracic spine when wearing the Leatt Brace compared to not wearing the Leatt Brace for the head-first impact.

As for data regarding range of motion, Dr. Kress testified that the data showed an affect on range of motion when wearing the brace. He concluded that this prevents "the ability to tuck and roll." (ECF 56-3, p. 161). He testified, "Data comparing the two [tests] from a force and acceleration standpoint are essentially not different as it relates to the catastrophic mechanisms. And–but it's basically a range of motion restricter. And that range of motion restricter makes it more vulnerable for those increased catastrophic forces." (ECF 56-3, p. 161). However, when asked to look at the forces, even with a limitation on range of motion, Dr. Kress acknowledged that the data shows that there was no increase in the "upper and lower neck forces measured down the spine" if the dummy is wearing the brace versus not wearing the brace. (ECF 56-3, pp. 161-62).

When asked, "[T]he thesis that wearing the brace increases the forces is not demonstrated by these data, is it?", Dr. Kress replied, "This data doesn't demonstrate that. However, what this data does demonstrate also is that the wearing of the brace does not affect it one way or another. There is no difference. It is not a *neck* protector for the catastrophic injuries." (ECF 56-3, p. 162). But Plaintiff in this case is not alleging that the brace failed to protect his neck; he is alleging that the brace caused his catastrophic thoracic injury by restricting his range of motion.

Dr. Kress was then asked, "[S]how me where in the data that you obtained in 2012 from the testing at Virginia Tech where you have demonstrated that there's an increase in forces down the axial spine created by wearing the Leatt-Brace." (ECF 56-3, p. 162). Dr. Kress answered,

> That wasn't the intent of the testing. I did not try to demonstrate that. I did not say the testing did do that.
> What, what this test data did is it tells me that the acceleration and forces associated with the brace versus the no brace are extremely similar, that the few items that shows[sic] some difference that's greater than experimental variation are relatively small and they're *unrelated* to thoracic burst fracture and— except for the fact that this analysis does confirm when you look at the nature of the fitment of the equipment that the range of motion is restricted more with the brace than no brace.
> Therefore, due to the decrease in range of motion an individual is more vulnerable to the axial type of loading. And the brace, will not produce that.

(ECF 56-3, p. 163) (emphasis added).

Thus, the 2012 Virginia Tech testing itself provides no scientific support for Dr. Kress' opinion in his Rule 26 report that wearing the brace causes higher force on the thoracic spine due to a limitation in the range of motion. No part of the test simulated the alleged movement permitted by a greater range of motion without the brace that Dr. Kress opines would avoid the potential axial loading on the spine. *See* (ECF 56-2, p. 9, opinion paragraph 1); *see also* (ECF 56-2, p. 10, opinion paragraph 5 ("Limiting the range of motion of a motorcross rider's head with a neck brace increases and focuses compressive loads onto the vertebrae.")). In other words, the Virginia Tech test did not simulate an attempted tuck and roll with and without the brace.

Plaintiff is correct that the results of the Virginia Tech testing show that "the Leatt brace restricted the head and neck movement when it was used." (ECF 71, p. 15). And Plaintiff is correct that this factual conclusion does not contradict Dr. Kress' opinion. *Id*. Plaintiff then incorrectly states that "how much it restricted the head and neck movement when used is for the jury to weigh."

*Id*. How much the brace restricts head movement is a quantifiable physical measurement that is not subject to weighing by the jury. Dr. Kress does not produce any such data.

There is a disconnect between the factual finding in the Virginia Tech study of some restriction in the head and neck range of motion when wearing the Leatt Brace and Dr. Kress' conclusions that Plaintiff was unable to perform a tuck and roll as a result of the limited range of motion, that Plaintiff *would have been able* to perform a tuck and roll under the same conditions without the brace, and that, as a result of a successful tuck and roll, Plaintiff would have landed in a position that would not have resulted in the axial loading on his thoracic spine from the impact. These are conclusions that require scientific analysis not provided by Dr. Kress.

In his response brief, Plaintiff asserts: "In regards to the study Dr. Kress conducted at Virginia Tech in 2012, there is no reason to believe that his reasoning and methodology is not reliable," (ECF 71, p. 13), and: "All of Defendant's arguments are criticisms of how the test was performed, the results of the test," *id*. at p. 15. The unsupported reassurances of counsel are insufficient to establish reliability. Defendant has not argued that the Virginia Tech study's reasoning and methodology itself was not reliable nor has Defendant criticized how the testing was performed or the results of the testing. Rather, the problem is that the Virginia Tech testing does not support Dr. Kress' thesis in this case that wearing the neck brace causes an increase in axial forces imparted to the spine.[4]

Finally, the Court notes Defendant's argument regarding two of Dr. Kress' "collateral" opinions. First, Dr. Kress opined that "Leatt did not adequately rely upon reasonable engineering

---

[4] Although not at issue in this case because Plaintiff did not suffer a neck injury, the Virginia Tech testing showed that torque ("bending moment") in the test dummy's upper neck was reduced by 24% when fitted with the Leatt Brace. (ECF 56-3, pp. 159-60). Also, the test dummy's angular head acceleration—that is, the movement of the head backward in relation to the torso—was reduced by 32% when fitted with the Leatt Brace. *Id*. at pp. 157-58.

analysis, testing, and/or literature to validate the safety status of their brace." (ECF 56-2, p. 10, opinion paragraph 2). Defendant argues that there is no support for this opinion in his report. The Court agrees. Nothing in Dr. Kress' report discusses, critiques, analyzes, or even evaluates the research and development preceding the sale of the Leatt Brace.

Second, Defendant argues that Dr. Kress' opinion that the "rigidity" of the Leatt Brace is a "primary problem" with the brace is also unsupported by any specific data or research other than Dr. Kress' conclusion based on his general knowledge. *See* (ECF 56-2, p. 10, opinion paragraph 3). The only testing Dr. Kress identified in his report in support of this opinion is the Virginia Tech testing. However, in his deposition Dr. Kress acknowledged that the brace is both adjustable and designed to break away at specific loading points. (ECF 56-3, pp. 109-10). Dr. Kress testified that the Virginia Tech testing measured forces applied to the test dummy's thoracic spine near the "thoracic strut" of the Leatt Brace and that the sensor placed under the strut during the two tests with the brace recorded external forces of 48 and 51 newtons, respectively, an average of 11.46 pounds, far below the brace's designed-in breakaway load of 300 newtons. (ECF 56-3, pp. 105-06, 153-55). Dr. Kress identifies no data, testing, or calculations showing that the thoracic strut or the "rigidity" of the Leatt Brace increased the likelihood of a user, or specifically Plaintiff, experiencing "devastating biomechanical restraints" and an increase in "compressive loads onto the vertebrae." (ECF 56-2, p. 10, opinion paragraph 5).

Dr. Kress' report in this case is silent as to how he determined that the limited range of motion caused by the Leatt Brace prevented Plaintiff from performing a tuck and roll that in turn would have prevented the injury Plaintiff sustained in his fall. Dr. Kress does not describe any tests regarding the range of motion necessary to perform a tuck and roll, whether a tuck and roll was

possible under the circumstances, and whether a tuck and roll would have prevented Plaintiff's injury. *See In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, at *11 (N.D. Ill. Mar. 31, 2017). There are no "principles and methodology" underlying the opinion related to the effect of tucking and rolling on injury to the thoracic spine. *See Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010) (citing *Winters v. Fru-Con, Inc.*, 498 F.3d 734, 742 (7th Cir. 2007)). Dr. Kress failed to "connect the dots" between the studies and materials that he lists on pages 2-9 of his report and his conclusion. *See Textron, Inc.*, 807 F.3d at 837.

Thus, the Court cannot assess any of the five *Daubert* reliability factors regarding Dr. Kress' theory, including "whether the expert's theory or technique can be or has been tested," 509 U.S. at 593-94, because Dr. Kress has not provided his method or testing for review. Dr. Kress' leap from Plaintiff's representation of what occurred and the Virginia Tech testing to Dr. Kress' untested explanation renders his opinion unreliable.

3.    *Failure to Account for Obvious Alternative Explanations*

The Seventh Circuit Court of Appeals has recognized that, "[i]n deciding whether an expert employed a reliable method, the district court has discretion to consider "'[w]hether the expert has adequately accounted for obvious alternative explanations.'" *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013) (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendment)).[5] Defendant argues that Dr. Kress' causation opinion did not account for obvious alternative explanations for Plaintiff's thoracic injury.

_____

[5] Defendant describes the factor as "reasonable" alternative explanations, but the comments and case law describe the factor as "obvious" alternative explanations.

Specifically, Defendant notes that, in the materials listed in Dr. Kress' report are multiple scientific and medical research articles demonstrating an alternative explanation for Plaintiff's injuries. Defendant obtained copies of several of those cited reports which showed that the most common spinal injury caused by a severe, head-first impact is the very mid-thoracic spine injury suffered by Plaintiff, and the literature explains the anatomical reasons for the injuries. All of the articles were published before Dr. Leatt invented the Leatt Brace. (ECF 56-3, pp. 174, 182, 193, 196, 210). Defendant attached five such articles, spanning 37 pages. *See* (ECF 56-6).

For example, in a medical article reporting on injuries to 266 motorcycle accident victims, researchers concluded, "The thoracic spine would seem to be particularly prone to trauma in a motorcycle accident victim." (ECF 56-6, p. 16 ("Thoracic Spine Injuries in Victims of Motorcycle Accidents," p. 595)). According to the authors of the article, the reasons for trauma to the thoracic spine are anatomical:

> As a person is catapulted over the handlebars of the motorcycle, flexion is accentuated by the motion of the fall and by the body's defense mechanism. This flexion serves to straighten out the cervical spine but accentuate the curvature of the thoracic spine. Forces from a blow to the top of the spine, or in this case across the shoulders, would then be transferred down the axial skeleton until the area of maximum curvature was encountered, the area between T4 and T7.

(ECF 56-6, p. 16).

In a second article, "Spinal Injury Patterns Resulting from Car and Motorcycle Accidents," researchers studied injuries to 1,121 motorcyclists with the objective of determining spinal injury patterns. (ECF 56-6, p. 18). The "Conclusion" in the article's abstract states, "The motorcyclists were more severely injured, had more extremity trauma, a higher mortality rate, and a spinal injury pattern consistent with forced hyperflexion of the thoracic spine." *Id*. In the "Discussion" section, the authors observed:

Thoracic injury in the unrestrained motorcyclist is thought to occur as a result of hyperflexion of the spine on impact with objects. Axial loading is concentrated at the point of maximal flexion and results in injuries predominantly in the midthoracic spine (T4 -T7) with T6 reported as the commonest level.

(ECF 56-6, p. 21).

Defendant questioned Dr. Kress about the data and conclusions in these articles at his deposition. (ECF 56-3, pp. 174, 182, 193, 196, 210). Dr. Kress conceded the accuracy of this data and the anatomical explanations. *See, e.g.*, (ECF 56-3, pp. 195-96). Dr. Kress was then asked to differentiate these findings from his opinion that thoracic spine injury was more likely with the Leatt Brace because axial loading is increased due to the limitation in the range of motion of the head, to which he responded,

[T]he way you differentiate is the spine, the thoracic spine, is most vulnerable to injury. And the — of the nature of [Plaintiff's] injury, the burst compression fracture, when you have it in a line such that you optimize or maximize that axial or longitudinal load, that load is optimized and maximized when the range of motion of the head is restricted. And the Leatt-Brace does that.

(ECF 56-3, pp. 200-01).

Counsel for Defendant then asked, "[I]f the literature establishes that [the] injury mechanism occurs most commonly of all vertebral fractures when there's no brace, how do you distinguish between that fracture occurring with no brace and that fracture occurring, as you hypothesize, because of a brace? How do you tell them apart?" (ECF 56-3, p. 201). Dr. Kress testified:

Well, independent of that from a biomechanical analysis standpoint, when you examine the effects of it you can understand from an engineering analysis standpoint that the forces and the axial load can be more highly concentrated in that orientation.

We know that from just testing. So that's one thing that said with the – I mean – and from the knowledge of the orientation of the anatomical structure of the spine.

With that said now, then you take it in context with the data observed and the analysis of the particular case at hand to understand what happened, what the skill

level of the rider was, what their experience was and how this compared to other types of incidents or accidents that they have experience with and develop an opinion based on the observed data, analysis and all the information on what's more likely than not.

*See* (ECF 56-3, pp. 201-02). This testimony does not differentiate between the anatomical explanation for the thoracic fractures occurring *without* a brace and Dr. Kress' theory that the thoracic fractures occur because of the brace. Again, Dr. Kress offers no data in his report on the degree to which the Leatt Brace restricts range of motion, and he has done no testing on the extent to which that limitation may or may not affect an individual's ability to tuck and roll in comparison with no brace.

As with the Virginia Tech testing, counsel for Plaintiff attempts to reassure the Court, with no citation to the record, that "[t]here is no reason to believe that Dr. Kress ignored any other reasonable explanations." (ECF 71, p. 14). Plaintiff cites *In re Mirena*, 169 F. Supp. 3d 396, 420 (S.D. N.Y. 2016), for its reasoning that "a lack of specific citation [to the studies] in her report goes to the weight of her opinions, not their admissibility" and that "[t]he fact that these studies are listed shows a reliable foundation upon which [the doctor] based her opinions." However, in *In re Mirena*, even though the specific studies were not cited, there was no dispute that the articles listed in the doctor's report contained the studies or that the studies said what the doctor reported. *Id*. In contrast, in the instant case, the literature Dr. Kress cites in his report supports an alternate theory that is at *odds* with his opinion and that Dr. Kress does not address in his report. In his response brief, Plaintiff does not acknowledge the content of these articles or attempt to explain how they can be reconciled with Dr. Kress' opinion. The fact that Dr. Kress lists these articles but does not address an obvious alternative explanation for Plaintiff's injuries in his report suggests, contrary to

Plaintiff's reassurances, that Dr. Kress *did* ignore this alternative explanation. Dr. Kress' failure to consider an obvious alternative explanation decreases the reliability of his opinion.

Plaintiff also asserts that Dr. Kress possesses the necessary education, skill, and experience to offer his opinion in the biomechanical and biomedical engineering fields. (ECF 71, p. 14). But Defendant does not challenge Dr. Kress' qualifications. Defendant challenges the reliability of Dr. Kress' opinions. Although Plaintiff is correct that Dr. Kress is independent from Leatt Corporation, his independence does not excuse the lack of a reliable methodology in forming his opinions.

*4.      Conclusion*

Dr. Kress' opinion is not "shaky" testimony that is admissible and subject to cross-examination to be weighed by the jury; his testimony is scientifically unreliable and, thus, inadmissible. *Allen*, 600 F.3d at 819 (quoting *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Daubert*, 509 U.S. at 596)). For the reasons set forth above, the Court concludes that, under Federal Rule of Evidence 702 and the standard set forth in *Daubert*, there is too great an analytical gap between the data and Dr. Kress' opinion and excludes his testimony on this basis. *Textron, Inc.*, 807 F.3d at 837 (internal quotation marks omitted (quoting *Joiner*, 522 U.S. at 138)). The Court grants Defendant's Motion in Limine to Exclude Proposed Opinion Testimony by Tyler Kress, Ph.D.

### IV. MOTION IN LIMINE TO EXCLUDE PROPOSED OPINION TESTIMONY BY RYAN HUGHES and MOTION TO STRIKE AFFIDAVIT OF RYAN HUGHES

Defendant moves to exclude the opinion of Plaintiff's expert Ryan Hughes on the basis that his report does not comply with the requirements of Federal Rule of Civil Procedure 26(a)(2)(B) and on the basis that, under Rule 702 and *Daubert*, Mr. Hughes is not qualified to express opinions on

product design, product testing, medical causation, or accident reconstruction and failed to employ a reliable methodology.

## A. Ryan Hughes' Opinion

On November 2, 2016, Ryan Hughes authored an opinion on the cause of Plaintiff's thoracic injury. The five-page report contains three sections: Background, Investigation, and Analysis and Opinion. Throughout the report, Mr. Hughes offers the following opinions:

- "In my conversation with [Plaintiff], we started talking about his crash and I told him exactly what had happened to him by the position his body was in when he went off the jump. A position his body was forced into from the inability to see up from an inadequate device." (ECF 59-2, p. 1).

- I then explained to him how he got paralyzed, explaining what happened after he was thrown off the bike and when he hit the ground being unable to tuck his head. When his head hit the ground, it was thrown backwards, pushing his head into the back of the brace that is resting on his spine. When all that force is put into one specific area, that is where the problem will occur. Every rider that has been paralyzed or has broken their back with one of these untested so called neck braces, has broken their backs right under the area where the brace stops at T4-5-6. [Plaintiff] was stunned because he said that is exactly what had happened to him. I told him it was a classic neck brace injury and there is no way around it.

*Id*. at p. 2.

- The problems I see with this poorly tested Leatt brace are as follows:

    1. The Leatt brace [Plaintiff] was wearing put him in a very dangerous position [sic] a motorcycle. The Leatt brace is designed for *after* the crash has happened and *we have no control of how we will land after the crash has happened*; but the dangerous position you are in before the crash magnifies the percentage of crashes. If you start out in a good position, you will end up in a good position. If you start out in a bad position, you will end up in a bad position, no matter how big or small the mistake or bobble is.

    2. When wearing the Leatt brace and you go over the front on the bike like [Plaintiff] did, you can't move and tuck your head when riding a motorcycle because the front of the brace is way too high, basically making you into a lawn dart. That is why you don't see any neck braces in America's toughest sports like football and

hockey, because when they go [sic] the ground or hit another player they need to instinctually be able to tuck their head and when your head is pushed forward, your helmet smashes against the front of the brace and can easily brake[sic] ribs, sternums and can lead to punctured lungs, bruised hearts, broken collarbones and dislocated and broken shoulders.

3. It is in[sic] my opinion that the Leatt Brace pushed [Plaintiff's] head over the front of the motorcycle and contributed to the crash. When you are getting kicked over the handle bars, the back of the brace has a fin that sticks out 6-8 inches that pushes against the back of the helmet forcing your head down. In order to do a front flip, you have to rotate your head forward, which is what the Leatt Brace is doing. It pushes the rider's head forward exaggerating that movement which is incorrect when you're being pushed over the handlebars. You want to get farther back on the motorcycle, not go forward. Then when you[sic] head hits the ground, it can either rotate to the side, front or back which will cause the helmet to hit the side, front or back of the brace braking[sic] collar bones, dislocating shoulders, etc. or even pulling the spinal column from the head. These injuries can occur because the head will hinge from the leverage of the helmet and neck brace hitting it or it can push the head backwards into the back of the brace, pushing into the immobilized plate that's resting directly on the spine at T4, T5 and T6. This is where Brock's injury occurred, breaking his back and causing him to be paralyzed for life.

*Id*. at p. 4 (emphasis added).

- "[H]is head went backward and hit the back of the brace. This pushed the back of the brace, which is made of hard Carbon fiber that has no movement or give, into his spine . . . . The Leatt brace is 100% the cause of this tragic accident. The brace is in fault all the way with his injury, no way around it or argument." *Id*. at p. 5.

- "The Leatt brace has been an inadequately tested product, with the majority of the testing done within the company's own facility or at their direction. The design is faulty because the brace is designed to take the load of impact in a crash off the neck, but places all the inertia directly into the spine." *Id*.

- "It is my opinion that the Leatt brace is a defective product because it prevented [Plaintiff] from being able to tuck his head in the crash and put the force of the impact into his spine." *Id*.

Defendant did not depose Mr. Hughes during discovery.

## B. Admissibility of Ryan Hughes' Opinions

As an initial matter, the Court grants in part and denies in part Defendant's Motion to Strike Affidavit of Ryan Hughes. Plaintiff attached an Affidavit of Ryan Hughes dated May 29, 2017, in support of his response to the instant Motion in Limine to Exclude Proposed Opinion Testimony by Ryan Hughes. Most of the Affidavit does not offer information that would change the Court's ruling on the Motion in Limine, and the Motion to Strike is denied to that extent. However, to the extent paragraphs 8 and 11 of the Affidavit contradict statements made in Mr. Hughes' Rule 26 report regarding forming his opinion at the outset of his conversation with Plaintiff and regarding his experience wearing the Leatt Brace, the Court grants the Motion to Strike, striking paragraphs 8 and 11 of Mr. Hughes' Affidavit.

Although the standard is set forth in more detail above in Part III.C, the Court again notes that Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702 and *Daubert*, the Court engages in a three-step inquiry to determine the admissibility of proffered expert testimony, asking whether (1) "the witness is qualified," (2) "the expert's methodology is scientifically reliable," and (3) "the testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers*, 629 F.3d

at 644 (quoting *Ervin*, 492 F.3d at 904). In the instant motion, Defendant argues that Mr. Hughes is not qualified and that his methodology is not scientifically reliable.

1.    *Mr. Hughes' Qualifications*

First, Defendant argues that Mr. Hughes lacks the knowledge, training, and experience necessary to be qualified to give opinions regarding the testing of the Leatt Brace, whether the Leatt Brace is "defective," the reconstruction of Plaintiff's accident, and the kinematics of Plaintiff's accident while wearing the Leatt Brace.

Mr. Hughes has been riding dirt bikes for nearly 40 years and raced for almost 30 of those years, winning approximately 100 races. He has personally experienced hundreds of crashes, including crashes similar to Plaintiff's accident underlying this case. Mr. Hughes trains and advises riders all over the world, including children and world champions, and he has personally observed their experiences. He left professional racing when he crashed in February 2013, fracturing multiple thoracic vertebrae; he was not wearing a Leatt Brace when he crashed.

"'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton*, 593 F.3d at 616 (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). In making this determination, a "court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith*, 215 F.3d at 718.

While there is no question that Mr. Hughes is an expert on the sport of motocross based on his specialized knowledge gained through years of personal experience, nothing in Mr. Hughes'

Rule 26 report identifies any education, training, or experience in product design, developmental testing, accident reconstruction, medicine, or biomechanics. Thus, Mr. Hughes is not qualified to testify on those technical or scientific topics regarding the mechanism of Plaintiff's injury.

Contrary to Plaintiff's assertion, Mr. Hughes' "personal experience and accompanying observations" in the sport of motocross does not mean that the "methodology Mr. Hughes applied in analyzing [Plaintiff's] accident and the subject Leatt neck brace are those that would regularly be employed by other experts in the field." (ECF 67, p. 4). Mr. Hughes' opinion about what he *believes* happened during Plaintiff's accident based on his experience does not make him an expert in the scientific and technical areas that are necessary for him to be qualified to testify at trial under Rule 702 and *Daubert* as to the cause of Plaintiff's crash or injury. This is not a situation in which "[t]he fact that an expert may not be a *specialist* in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) (emphasis added). In those instances, the expert is otherwise qualified, such as a physician who is qualified to testify as to whether a seizure occurred even though the physician is not specialized in pathology. *Id*. Mr. Hughes is not generally qualified in the necessary scientific and technical fields to opine on causation in this case.

Mr. Hughes is qualified as a motocross expert and can give opinions based on that expertise that would assist the jury in understanding the sport of motocross. *See Kumho*, 526 U.S. at 156. However, none of his opinions on motocross topics are relevant to the issue of causation in this matter. Thus, the opinions that he is qualified to give would not be useful to the jury.

Plaintiff also argues that Mr. Hughes' motocross experience makes him an expert such that his testimony would assist the jury "in understanding . . . the consequences of using the Leatt brace."

(ECF 67, p. 4). However, Mr. Hughes' Rule 26 report reveals that he does not have sufficient personal experience with the Leatt Brace to assist the jury: "[A]fter I rode with [the brace] for the first time, I almost crashed two times on the first lap going into a corner because I couldn't see up! I felt so awkward with it on because of the position it put me in. I took it off while I was riding, threw it to my mechanic and told him to throw it in the trash . . . ." (ECF 59-2, p. 1). Although Mr. Hughes has likely observed thousands of races in his career, he cannot have personal knowledge of all races and all injuries across the country. Although he has observed "hundreds" of crashes, he offers no statistics regarding how many of those involved a Leatt Brace, if any. While Mr. Hughes is a motocross coach and trainer with decades of experience, nowhere does he quantify his experience working with and/or observing the Leatt Brace; he does not represent that he has personal experience training or coaching individuals who wear the Leatt Brace. Thus, Mr. Hughes is not qualified based on experience to give opinion testimony regarding the effects of wearing the Leatt Brace.

Finally, Plaintiff's attempt to define Mr. Hughes' opinions on causation as "non-scientific" is not well taken. *See* (ECF 67, p. 5). Although Mr. Hughes' opinions regarding the sport of motocross are not scientific, the cause of Plaintiff's injury is. The relevant areas of his proposed testimony are not about the sport of motocross but rather about accident reconstruction, kinematics, biomechanics, product design, and product testing. Mr. Hughes' motocross experience does not align with the subjects of his causation opinions.

*2.     Reliability of Mr. Hughes' Methodology*

Second, Mr. Hughes' opinions are not "ground[ed] in the methods and procedures of science." *Daubert*, 509 U.S. at 590-91. Even if were qualified to give expert testimony, his

opinions fail all five of the *Daubert* reliability factors: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; (4) whether standards and controls exist and were maintained; and (5) whether the theory has been accepted in the relevant scientific community. *Lewisby*, 843 F.3d at 659 (citing *Daubert*, 509 U.S. at 593-94).

Mr. Hughes' opinions about the causation of Plaintiff's physical injuries are based on anecdotal evidence consisting of Mr. Hughes' own observations as a participant in the motocross sport, what he has "heard" about accidents, and what he believes happened to Plaintiff during his accident. Mr. Hughes' report contains no quantifiable data or statistics of any kind. Mr. Hughes offers no evidence that he has ever undertaken product design or testing or performed biomechanical reconstruction of accidents. He has no meaningful personal experience with the Leatt Brace, and he offers no evidence that he did any scientific testing of the brace. He does not identify the medical literature or knowledge that he relied upon to support his opinion that Plaintiff's injury is a "classic neck brace injury." He offers no data or statistics on the number of motocross injuries that have occurred, the types of injuries riders have suffered, and the variation in injuries with and without the Leatt Brace. Mr. Hughes did not attempt to recreate Plaintiff's accident, take measurements, or quantify the physical forces involved. As for the two photographs Mr. Hughes attached to his report showing the position of a rider on a bike with and without the Leatt Brace with the intent to show that the Leatt Brace forces the wearer into an improper riding position, Mr. Hughes offers no scientific, reproducible methodology for the creation of the staged photos.

Mr. Hughes formed his opinion on the causation of Plaintiff's injury early in his conversation with Plaintiff: "In my conversation with [Plaintiff], we started talking about his crash and I told him

exactly what had happened to him by the position his body was in when he went off the jump . . . . He was shocked that I could explain what had happen[sic] without seeing the crash." (ECF 59-2, p. 1). An expert may not "start[] his analysis based upon the assumption that the product failed (the very question that he was called upon to resolve)." *Clark*, 192 F.3d at 757.

Mr. Hughes has not identified any reliable methodology used to arrive at his conclusions that the Leatt Brace was inadequately tested, that the Leatt Brace is defective or faulty, that the Leatt Brace put Plaintiff in a dangerous position on the motorcycle, that the Leatt Brace caused Plaintiff to be launched from his motorcycle, that the Leatt Brace prevented Plaintiff from being able to tuck his head, that pressure from the Leatt Brace on the outside of Plaintiff's spine fractured his vertebrae, or that the "brace is in fault all the way with [Plaintiff's] injury." (ECF 59-2, p. 5).

*3.     Admissibility of Mr. Hughes' Opinions*

Because Mr. Hughes is not qualified to opine on the scientific topics set forth in his report and because Mr. Hughes' opinions are not founded on a reliable methodology, the Court excludes Mr. Hughes' opinions under Rule 702 and *Daubert*. The Court declines to undertake an analysis of whether the report should also be excluded under Rule 37(c)(1).

### CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the Motion to Strike Declaration of Tyler Kress, Ph.D. [DE 74], **GRANTS in part** and **DENIES in part** the Motion to Strike Affidavit of Ryan Hughes [DE 85], **GRANTS** the Motion in Limine to Exclude Proposed Opinion Testimony by Tyler Kress, Ph.D. [DE 55], and **GRANTS** the Motion in Limine to Exclude Proposed Opinion Testimony by Ryan Hughes [DE 58].

SO ORDERED this 14th day of September, 2017.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT