BROCK C. LYONS,           )
     Plaintiff,         )
                        )
     v.                   )       CAUSE NO.: 4:15-CV-17-PRC
                        )
LEATT CORPORATION,      )
     Defendant.       )

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 62], filed by Defendant Leatt Corporation on May 1, 2017. Plaintiff Brock C. Lyons filed a response on May 30, 2017, and Defendant filed a reply on June 12, 2017. Because expert testimony is required for Plaintiff to prove his claims and because the Court has excluded the opinions of Plaintiff's experts, the Court grants Defendant's Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

In his Amended Complaint, Plaintiff Brock Lyons alleges that he was injured on April 13, 2014, when the Moto GPX Sport Leatt-Brace, advertised, marketed, distributed, and promoted by Defendant Leatt Corporation, "caused and/or failed to protect Plaintiff from serious bodily injury" while Plaintiff used the brace in a reasonably foreseeable manner.

Count I is brought under the Indiana Products Liability Act, alleging that Defendant should be held strictly liable as a designer, manufacturer, distributor, and seller of the brace, which was in a defective condition and unreasonably dangerous to expected users such as Plaintiff. Count II alleges a claim of breach of warranty for failing to protect Plaintiff from serious bodily injury, alleging that Defendant made implied and express warranties that the brace was reasonably fit for the general uses and purposes intended and that it was free of any defects in its design or

construction. Count III alleges that Defendant negligently designed, manufactured, marketed, and distributed the brace in such a manner that it created an unreasonable risk of physical harm and injury and that Defendant failed to warn of the known and foreseeable hazard of the brace. Count IV alleges gross negligence and seeks punitive damages. On November 10, 2015, the Court dismissed Count V, which alleges deceptive and misleading advertising and marketing.

On May 1, 2017, Defendant filed motions to exclude the expert witness testimony of Plaintiff's proffered expert witnesses, Tyler Kress, Ph.D. and Ryan Hughes. On September 14, 2017, the Court granted both motions, excluding the opinions of Dr. Kress and Mr. Hughes.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure require that a motion for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment is appropriate when no material fact is disputed and the moving parties are entitled to judgment as a matter of law, meaning that no reasonable jury could find for the other party based on the evidence in the record." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes

demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56 (a), (c). The moving party may discharge its initial responsibility by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015). When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex*, 477 U.S. at 323, 325; *Spierer*, 798 F.3d at 507-08; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168-69 (7th Cir. 2013).

"Once the moving party puts forth evidence showing the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(c)(1), (e); *Flint v. City of Belvidere*, 791 F.3d 764, 769 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1986)). Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248-50.

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *McDowell v. Vill. of Lansing*, 763 F.3d 762, 764, 765 (7th Cir. 2014); *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50.

## MATERIAL FACTS

The following are the material facts supported by the evidence of record.[1] Defendant Leatt Corporation is the manufacturer, seller, and distributer of the Moto GPX Leatt-Brace (Leatt Brace). (ECF 83-2, pp. 4-5 (Resp. to Inter. No. 4)).[2] The purpose of the Leatt Brace "is to reduce neck forces in various combinations and at various times during a crash" with the "aim [of reducing] the incidence and severity of cervical spine trauma, especially in situations involving an unrestrained

---

[1] The "Materials Facts" asserted by Defendant on page 2 of its brief are not supported by any citation to evidence.

[2] Plaintiff represents in his Statement of Genuine Issues that Defendant has "revised the design of the Leatt-Brace five times." (ECF 83, p.3). This is not supported by the cited deposition testimony of John Bodnar, M.D. When asked "How many models have they had in between?", Dr. Bodnar responded, "I believe five." (ECF 83-4, p. 9 (Bodnar Dep. p. 66)). A few questions later, Dr. Bodnar testified that he believes Plaintiff was wearing "the second version." *Id.* p. 10 (Bodnar Dep. p. 67). Defendant asserts that Dr. Bodnar was testifying that there are five models of neck braces and not five versions of the GPX brace. *See, e.g.*, https://www.leatt.com (offering neck braces for a variety of sports under "products" including "moto," "bike," and "wintersport") (last visited Sept. 13, 2017). Regardless, this fact is not material to the outcome of this motion because, even if there were multiple versions of the GPX brace and Plaintiff was wearing a later version, Plaintiff has offered no evidence of the changes to the brace with each version or that the changes are relevant to the issues in this litigation.

Although Plaintiff attached the pages of Dr. Bodnar's deposition, Plaintiff does not identify Dr. Bodnar nor did Plaintiff include the cover/first page of his deposition. However, Dr. Bodnar's curriculum vitae, attached to an earlier filing by Defendant, indicates that Dr. Bodnar is an emergency medicine physician in California, the Chief Medical Officer of the International Motorcycling Federation, and the Track Physician for the AMA Supercross and Motocross Professional Series of the American Motorcyclist Association. *See* (ECF 76-1, p. 4).

human torso." *Id.* at p. 12 (Resp. to Inter. No. 12).[3] The Leatt Brace is sometimes referred to as the "helmet for your neck." *Id.* According to Leatt's white paper, "Research and Development Efforts towards the Production of the Leatt-Brace® Moto GPX Unrestrained Torso Neck Brace" ("White Paper"), fifteen criteria were used in developing the Leatt Brace, including the following four listed by Plaintiff in his brief:

> - To find the best compromise between decreasing dangerous ranges of motion, neck forces and impulse momentum relationships, whilst maintaining driver/rider usability.
> - To prevent extreme ranges of motion producing/associated injury.
> - To maintain [range of motion (ROM)] to the extent that overly restricted ROM would result in high axial forces, i.e., to preserve the head's ability to move out of the way of the impact force.
> - To allow the neck to continue to move in order to reduce compression injuries, but to prevent the extreme movement that can produce injury.

(ECF 83-3, p. 3-4 (White Paper, pp. 44-45)).[4]

The White Paper further explains, in the section titled "Allowable ROM," that the Leatt Brace "restricts extreme ranges of movement that cause injury but allows sufficient freedom of movement so as not to transmit excessive forces to the helmet or to limit vision below that required for safe and competitive operation." *Id.* at p. 5 (White Paper, p. 46).[5] In its sworn interrogatory

---

[3] In his response brief, Plaintiff incorrectly generalized this purpose of reducing the "incidence and severity of *cervical* spine trauma" to "spine trauma." (ECF 83, p.2).

[4] Plaintiff did not include a cover or title page showing the title and date of the White Paper. The title is listed on Defendant's website: https://www.leatt.com/company/leatt-knowledge-library/ (last visited Sept. 14, 2017). However, the link to the document on the website is not active.

[5] In his Statement of Genuine Issues, Plaintiff quotes portions of this excerpt from the White Paper along with portions of Dr. Bodnar's testimony to support this statement:

> The Leatt-Brace was designed to restrict "extreme ranges of movement that cause injury [while still allowing] sufficient freedom of movement" so the rider could maneuver his head to "get out of the way" and/or engage in safety movements such as the tuck and roll in the event of an accident.

(ECF 83, p.3 (citing ECF 83-3, p. 5 (White Paper, p. 46); ECF 83-4, p. 17, 18 (Bodnar Dep., pp. 123:1-14, 125:1-8))). Neither the White Paper nor Dr. Bodnar discusses the design of the Leatt-Brace or any brace in relation to a tuck and roll maneuver. Dr. Bodnar's testimony simply describes the "tuck and roll" maneuver and agrees that it is an "evasive or safety measure." (ECF 83, p.3 (citing (ECF 83-4, p. 17, 18 (Bodnar Dep., pp. 123:1-14, 125:1-8))). Also, Plaintiff did

response, Defendant explains, "The rationale of the Leatt-Brace® is to bring a rapidly moving, out-

---

not include page 124 of the deposition, which contains the question to which Dr. Bodnar responds on page 125.

    Next in the Statement of Genuine Issues, Plaintiff incorrectly quotes Dr. Bodnar's deposition testimony by inserting the word "axial." Plaintiff writes, "The Leatt-Brace was designed to 'transfer the [axial] load directly from the neck' to other parts of the body to prevent impact 'directly onto the spine.'" (ECF 83, p.3 (quoting ECF 83-4, p. 13 (Bodnar Dep., p. 72:20-25))). First, the question asked of Dr. Bodnar was not specific to the Leatt Brace but to neck braces in general: "What is the purpose of a neck brace?" (ECF 83-4, p. 13 (Bodnar Dep., p. 72)). Second, Dr. Bodnar did not discuss "axial" loads in his answer: "It's—from what I can gather from all the testing I've read and studies is it's going to transfer the load directly from the neck to distribute it across the body so there is no impact zone directly onto the spine." *Id.*

    In the same paragraph in the Statement of Genuine Issues, Plaintiff incorrectly generalizes the type of injury at issue in one of the Leatt Brace design considerations, stating:

> One "important design consideration" was to ensure that the Leatt-Brace was the "correct size and shape to prevent helmet projection over its edges," as an incorrect size or shape could result in a "fulcrum effect," where the helmet projects over the edge of the Leatt-Brace and pivots around the contact point, *causing "potentially devastating" injury.*

(ECF 83, p. 3 (emphasis added) (citing ECF 83-3, p. 6 (White Paper, p. 47))). However, the White Paper indicates this design is to prevent a specific neck injury, not any potentially devastating injury:

> Another important design consideration ensures that the device has the correct size and shape to prevent helmet projection over its edges. An incorrect size or shape of the brace can result in a "fulcrum effect". This is where the helmet projects over the outer edge of the device and pivots around the contact point, *causing a potentially devastating bending moment or torque on the neck of the rider.*

(ECF 83-3, p. 6 (White Paper, p. 47)) (emphasis added). Moreover, this design intent is not material because Plaintiff is not alleging nor has he offered any evidence that his accident or injury was caused by his helmet pivoting around a contact point with the edge of the Leatt Brace.

    In the Statement of Genuine Issues, Plaintiff misrepresents the purpose of the GPX "thoracic struts," which Plaintiff represents "were intended to prevent rotation around the thorax *to prevent spinal injury,*" (ECF 83, p. 3(emphasis added) (citing ECF 83-3, p. 8 (White Paper, p. 54); ECF 83-4, p. 10 (Bodnar Dep., p. 67:2-17, 23-25))), and were "'engineered with specific tolerances' such that they were 'designed to break away' on impact *to prevent fractures to the thoracic vertebrae.*" *Id.* (emphasis added) (citing ECF 83-3, p. 8 (White Paper, p. 54); ECF 83-4, p. 11(Bodnar Dep., p. 68:5-10)). However, the White Paper says neither:

> The thoracic member and the strut of the Moto GPX were designed to prevent the upper platform of the Moto GPX from rotating when helmet strike forces are present, and to prevent the brace from rotating around the thorax. The carbon fiber strut was engineered with specific tolerances to ensure failure during extreme helmet impact events. *The strut is designed to break at relatively low loads compared to high forces needed to fracture a thoracic vertebra.*

(ECF 83-3, p. 8 (White Paper, p. 54)) (emphasis added). And Dr. Bodnar's testimony states only that Plaintiff's GPX Leatt Brace had thoracic struts and that the struts are designed to break off under certain circumstances. *See* (ECF 83-4, pp. 10-11 (Bodnar Dep., pp. 67:2-17, 23-25; 68:5-10)). Moreover, Plaintiff has not designated any evidence that his thoracic injury was caused by an external force, much less from the external pressure of the thoracic strut.

    Plaintiff also cites Dr. Bodnar's deposition for the factual assertion: "While the Leatt-Brace focuses more on protecting the cervical spine over the thoracic spine, other companies have manufactured and produced protective equipment which run down and protect the 'whole back.'" (ECF 83, p. 3 (quoting ECF 83-4, p. 2 (Bodnar Dep., 21:1, 60:20-25; 100:8-13))). However, Dr. Bodnar was asked, "Is there any brace designed to protect the T part of the spine?", to which Dr. Bodnar responded, "There's several companies making *chest protectors* that have T spine parts that run down the whole back that are supposed to — that are meant to protect the back." (ECF 83-4, p. 15 (Bodnar Dep., p. 100)) (emphasis added). Dr. Bodnar does not explain and he was not asked what this protective equipment protects the back from. Plaintiff offers no evidence that this equipment is designed to protect the spine from injury due to axial forces, nor does Plaintiff identify any of this equipment in order to compare it to the Leatt Brace. Thus, this testimony of Dr. Bodnar cannot support Plaintiff's argument that there is a known alternative design to the Leatt Brace. *See* (ECF 83, p. 18).

of-control head to a controlled stop and, in the process, to reduce or eliminate the potential for serious neck injury." (ECF 63-1, p. 16 (Resp. to Inter. No. 12)). Defendant further explains in the interrogatory response:

> In some accident scenarios, the cervical spine can experience forces that do not, at least initially, involve flexion or extension of the neck but instead are predominantly axial in nature. Axial force (measured in Newtons) is that which occurs in the longitudinal direction of the cervical spine, *i.e.*, parallel to the spine. . . . When it is excessive, an axial load can damage the IV discs and cause them to rupture or, in extreme cases, cause the vertebral bodies to fracture. Fractured vertebral bodies can damage the associated spinal cord segment and result in paralysis or death.

*Id*. at p. 17.

The American Motorcyclist Association does not require a rider to wear a neck brace because the track physicians determined that there was not "enough medical data to conclusively show that they were more beneficial from a medical scientific perspective." (ECF 83-4, pp. 4-5 (Bodnar Dep., pp. 38-39)).[6]

Plaintiff Brock C. Lyons was a professional ATV racer and motocross rider who began riding ATVs and motorcycles when he was three years old. (ECF 83-5, pp. 2-4 (Pl. Dep., pp. 69-71)). At age 16, Plaintiff began professionally racing ATVs; in 2012, he switched to racing motorcycles on the amateur level. *Id*. at pp. 3, 5, 21 (Pl. Dep., pp. 70, 72, 124).

---

[6] Plaintiff states in his Statement of Genuine Issues: "Use of the Leatt-Brace reached its peak around 2013, when it was worn by 30-45% of motocross riders; however, use of the Leatt-Brace has steadily declined, with only 10% of riders wearing the Leatt-Brace in 2016." (ECF 83, p. 4 (citing ECF 83-4, pp. 7, 8 (Bodnar Dep. 61:6-16; 63:13-15); Hughes Aff. ¶ 12)). First, Dr. Bodnar's testimony addresses "neck braces" in general and not the Leatt Brace. Ryan Hughes, whose expert opinion on causation has been excluded, states that, based on "trends within the Motocross community" he has "observed a decline in the number of professional riders who wear the Leatt-Brace due to its impact on the rider's form and field of vision and its reputation for restricting movement and causing and/or increasing the severity of injuries." (ECF 83-8, pp. 12-13 (Hughes Decl., ¶ 12)). Both Dr. Bodnar and Ryan Hughes' statements are regarding professional riders. Dr. Bodnar's testimony was specifically as to his records kept regarding the 250 class and 450 class competitions. *See also* (ECF 88-1, p. 5 (Bodnar Report, p. 4)). Neither statement is material to the issues of defect or causation in this case.

In 2007, Plaintiff purchased a Leatt Brace "to protect [his] neck and back." *Id*. at pp. 13, 14 (Pl. Dep., pp. 105, 107). After purchasing the Leatt Brace, Plaintiff reviewed instructional videos and adjusted the thoracic struts of the brace pursuant to the recommendations. *Id*. at pp. 22, 23 (Pl. Dep., pp. 134, 135). Plaintiff testified that the Leatt Brace affected his ability to ride by limiting the range of motion in his neck, shoulders, and head. *Id*. at p. 24 (Pl. Dep., p. 143). However, Plaintiff wore the Leatt Brace "every time [he] rode" (except for snowmobiles) for seven years, from 2007 until his injury in 2014, including his last year of professional-level competition on the ATV racing circuit. (ECF 71-5, pp. 106, 113, 114, 115, 142 (Pl. Dep.)).

On April 13, 2014, Plaintiff Brock C. Lyons was riding his motorcycle at Wildcat Creek MX track in Rossville, Indiana. (ECF 64-1, p. 7); (ECF 83-5, p. 149). He was wearing his Leatt Brace and his 6D helmet. (ECF 64-1, p. 7). When he rode over a "step up" jump, he landed "nose high" on the back tire at a 55 degree attitude and was sent over the handle bars when he was unable to bring the nose of the bike down by getting his weight forward on the bike. (ECF 64-1, p. 7); (ECF 83-5, p. 149). Plaintiff estimates that the speed at which he left the motorcycle was approximately 40 to 45 miles per hour and that he traveled 10 to 15 feet in the air before he impacted the ground. (ECF 64-1, p. 10).

The following excerpts from Plaintiff's deposition regarding the crash are cited by Plaintiff in his brief:

```
6    Q    Now, I know the experience of having your hands,
7         like, torn off the handlebars. You're trying to
8         hold on.
9    A    Uh-huh, yeah.
10   Q    But you had no chance to hold on. You went
          straight over the bars with the slap.
12   A    Yes, Yes.
13   Q    What do you recall about first contacting the
```

| 14 | | track? |
|----|---|--------|
| 15 | A | When I came off the bike? |
| 16 | Q | Yes. |
| 17 | A | I went to the left side, and I tried to tuck my |
| 18 | | head into an Army roll. Bear with me. Sorry. So |
| 19 | | when I tried to do that, I came down. And I |
| 20 | | remember hitting, and it peeled my head back fast. |
| 21 | | I tried to roll, and when I hit, it shoved my whole |
| 22 | | head back, and I wasn't able – typically an Army |
| 23 | | roll would be the best. I tried to tuck and roll, |
| 24 | | and I wasn't able to. It caught the ground and |
| 25 | | pushed my head back. And as soon as it did that, I |
| 1 | | felt everything go numb, and then I rolled down the |
| 2 | | hill. |

(ECF 83-5, p. 33 (Pl. Dep., pp. 173: 6-25, 174:1-2)).

| 9 | Q | What impacted what to force your head back, as |
|----|---|--------|
| 10 | | you've demonstrated? |
| 11 | A | The ground. When I went to go down, I couldn't |
| 12 | | tuck my head. So my visor caught and – because |
| 13 | | all the weight, I'm going forward. It's head |
| 14 | | first. I'm trying to tuck so I can just do my roll |
| 15 | | out. And I couldn't tuck, and it just shoved my |
| 16 | | head back. |
| 17 | Q | What was the attitude of the rest of your body when |
| 18 | | your helmet – |
| 19 | A | Are you familiar with a scorpion? |
| 20. | Q | Yes. |
| 21 | A | Are you familiar with that term for – |
| 22 | Q | I am. |
| 23 | A | I did a scorpion. |
| 24 | Q | Okay. |
| 25 | A | Instead of tucking into a ball and rolling, my head |
| 1 | | hit, my back arched, my legs came up, and I looked |
| 2 | | like a human scorpion. |

(ECF 83-5, p. 34 (Pl. Dep., pp. 174: 9-25, 175:1-2)).

| 2 | Q | So going back to your impact with the track, you |
|----|---|--------|
| 3 | | spoke of a visor. But did you really mean the |
| 4 | | visor, like the roost guard visor of your helmet? |
| 5 | A | Can we say the front left of my helmet? I don't |
| 6 | | know how else to put it, whether it was the visor |

7                         or the shell of the helmet.

(ECF 83-5, p. 36 (Pl. Dep., p. 177:2-7)).

As a result of the crash, Plaintiff suffered severe three-column fractures of the thoracic spine at T5-6 with T5-6 jumped facets with spinal cord obliteration, which left Plaintiff permanently paralyzed. (ECF 64-1, p. 11).

Plaintiff had ridden the Wildcat Creek MX track hundreds of times and "could ride it with [his] eyes closed." (ECF 83-5, pp. 29, 31 (Pl. Dep., pp. 158, 160)). This was the first wreck Plaintiff had while wearing the Leatt Brace since he had begun wearing it seven years earlier. *Id.* at pp. 18, 20 (Pl. Dep., pp. 112, 115); (ECF 71-5, p. 147). Plaintiff had experienced a number of wrecks throughout his ATV and motocross careers, incurring relatively minor injuries. *Id.* at pp. 6-8, 35 (Pl. Dep., pp. 83-85, 175).

Plaintiff cites his own deposition testimony regarding the fit of the Leatt Brace in relation to his helmet:

```
1    Q    Right. So at any time that you were riding
2         competitively while wearing a Leatt neck brace did
3         you think that the brace handicapped you in riding
4         the equipment?
5    A    Yes.
6    Q    In what way?
7    A    Less movement.
8    Q    And specifically.
9    A    Less movement in your neck and shoulders. It
10        limited your range of movement in your head.
```

(ECF 83-5, p. 24 (Pl. Dep., p. 143:1-10)).

```
17   Q    So when you were wearing the Leatt brace, no matter
18        what you were riding, and you were wearing a full
19        face helmet, looking down, for example, the bottom
20        edge of the helmet would come into contact with the
21        brace.
```

10

| 22 | A | Yes. |
| 23 | Q | Or looking up, the back edge of the helmet; right? |
| 24 | A | Correct. |
| 25 | Q | So you were aware that at sort of the end of that |
| 1 | | range of motion you would come into contact with |
| 2 | | the brace. |
| 3 | A | Correct. |
| 4 | Q | And that's what you were referring to as the |
| 5 | | limitation in the motion? |
| 6 | A | Yes. |
| 7 | Q | And what did you understand that limitation in the |
| 8 | | motion to mean, if anything? |
| 9 | A | I didn't understand anything about it other than it |
| 10 | | was there to protect you. So if that's the |
| 11 | | tradeoff, I was willing to accept it. |
| 12 | Q | Okay. Did you understand that that |
| 13 | | extreme range of motion—if you didn't have the |
| 14 | | neck brace there to stop your helmet from going down or going |
| 15 | | back or going sideways, did you have |
| 16 | | any understanding that that was, in fact, the way |
| 17 | | the neck brace worked? |
| 18 | A | Yeah. I assume that's what it was supposed to do, correct. |

(ECF83-5, pp. 24, 25 (Pl. Dep., pp. 143:17-15, 144:1-19)).

| 2 | Q | Well, what part of your posture did you think was |
| 3 | | affected by wearing the brace? |
| 4 | A | My — the balls of my feet where you placed on the |
| 5 | | bike, where your knees are gripping the seat, and |
| 6 | | how far forward you are on the bike. |

(ECF 83-5, p. 39 (Pl. Dep., p. 192:2-6)).

| 1 | Q | So what position did Ryan Hughes take, physically |
| 2 | | what posture did he take, to suggest that there was |
| 3 | | a difference in the way that you would sit the bike |
| 4 | | by wearing the Leatt brace? |
| 5 | A | Everything you just referenced is lower body. I'll |
| 6 | | reference the upper body and your line of sight. |
| 7 | | If you have the Leatt on and you don't have much of |
| 8 | | a neck, given me, if you're trying to be in your |
| 9 | | attack position looking forward and you're making |
| 10 | | contact with the back, your visor is in the way and |

| 11 |   | your line of sight is here. So now you have to sit |
| 12 |   | in more of an upright position to have that proper |
| 13 |   | line of sight. |
| 14 | Q | So particularly what you're describing in |
|   |   | that sequence is that, if you're leaning forward and you |
|   |   | still need to see up, the back of the helmet is |
|   |   | contacting the back of the platform. |
| 18 | A | Yes. |
| 19 | Q | All right. So if you want to have the same angle |
| 20 |   | of vision, you lean your upper body back a little |
| 21 |   | bit. |
| 22 | A | And your hips forward. You've got to get the |
| 23 |   | weight forward if you want the bike to work |
| 24 |   | properly. So now instead of having hips back, on |
| 25 |   | your toes, you've not got your hips and butt |
| 1 |   | forward, because you have to get that weight |
| 2 |   | forward, especially going around the corners. |
| 3 |   | That's how you have to steer. So it's changing |
| 4 |   | your position. |

(ECF 83-5, pp. 40, 41 (Pl. Dep., pp. 194:5-25, 195:1-4)).

## ANALYSIS

Defendant Leatt Corporation moves for summary judgment on all of Plaintiff's claims, arguing that Plaintiff cannot make out a prima facie case under the Indiana Products Liability Act (IPLA) because the questions of whether the Leatt Brace was in a defective condition and whether it caused Plaintiff's injuries require expert testimony and the Court has excluded Plaintiff's experts' opinions. Plaintiff responds that, notwithstanding the exclusion of his experts, the questions of defect and causation in this case are within the understanding of lay people and the circumstantial evidence of record creates a genuine issue of fact for trial as to all of his claims.

"The IPLA governs all actions brought by a user or consumer against a manufacturer for physical harm caused by a product, regardless of the legal theory upon which the action is brought." *Piltch v. Ford Motor Co.*, 778 F.3d 628, 632 (7th Cir. 2015) (citing Ind. Code § 34-20-1-1); *see also*

*Weigle v. SPX Corp.*, 729 F.3d 724, 737 (7th Cir. 2013) (giving a history of the IPLA); *Stegemoller v. ACandS, Inc.*, 767 N.E.2d 974, 975 (Ind. 2002). In other words, the IPLA governs both strict liability claims as well as claims sounding in negligence.

To make out a prima facie case under the IPLA, a plaintiff must prove that "'(1) he or she was harmed by a product; (2) the product was sold "in a defective condition unreasonably dangerous to any user or consumer"; (3) the plaintiff was a foreseeable user or consumer; (4) the defendant was in the business of selling the product; and (5) the product reached the consumer or user in the condition it was sold.'" *Piltch*, 778 F.3d at 632 (quoting *Bourne v. Marty Gilman, Inc.*, 452 F.3d 632, 635 (7th Cir. 2006) (referencing Ind. Code § 34-20-2-1)); *see also U-Haul Intern., Inc. v. Nulls Mach. and Mfg. Shop*, 736 N.E.2d 271, 281 (Ind. Ct. App. 2000). A product is defective "if, at the time it is conveyed by the seller to another party, it is in a condition: (1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expected ways of handling or consumption." Ind. Code § 34-20-4-1.

A plaintiff can establish a defective condition by showing a design defect, a manufacturing defect, or a failure to warn. *Piltch*, 778 F.3d at 632 (citing *Hathaway v. Cintas Corp. Servs., Inc.*, 903 F. Supp. 2d 669, 673 (N.D. Ind. 2012); *Nat. Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 161 (Ind. Ct. App. 1997)); *see also Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277, 281 (Ind. 1983); *Cook v. Ford Motor Co.*, 913 N.E. 2d 311, 319 (Ind. Ct. App. 2009). The plaintiff must also prove that his injuries were proximately caused by the defect or the breach of duty. *Piltch*, 778 F.3d at 632 (citing *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007)).

Expert testimony is needed under Indiana law to establish both defect and causation when "the issue is not within the understanding of a lay person." *Id*. (citing *Daub v. Daub*, 629 N.E.2d 873, 878 (Ind. Ct. App. 1994) (requiring expert testimony on the issue of cause outside the understanding of a lay person); *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1103-04 (S.D. Ind. 2003) (requiring expert testimony where the existence of a defect depends on matters beyond the understanding of lay person)). The Court finds that, because the manner in which the Leatt Brace operates and the manner in which Plaintiff was injured are beyond the understanding and knowledge of lay jurors, expert testimony is needed to establish that the Leatt Brace worn by Plaintiff was defective and to establish causation.

1.    *Manufacturing Defect*

A manufacturing defect exists if the product "deviates from its intended design." *Piltch*, 778 F.3d at 632-33 (citing *Hathaway*, 903 F. Supp. 2d at 673). "[U]nder [the IPLA] a plaintiff may use circumstantial evidence to establish that a manufacturing defect existed only when the plaintiff presents evidence by way of expert testimony, by way of negating other reasonably possible causes, or by way of some combination of the two." *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1209 (7th Cir. 1995); *see also Piltch*, 778 F.3d at 633 (considering whether the circumstantial evidence raised a genuine issue of material fact in the absence of expert testimony and finding that it did not).[7]

In his response brief, Plaintiff asserts that "the Leatt-Brace was not manufactured in accordance with its design to prevent the rider's helmet from protruding over its edges." (ECF 83, p. 15). Plaintiff offers no evidence, either expert or circumstantial, to support this statement.

_____

[7] Although it is possible, in rare instances, to prove manufacturing defect under the doctrine of *res ipsa loquitur*, Plaintiff does not advance the doctrine in this case. *See Piltch v. Ford Motor Co.*, 778 F.3d 628, 634-35 (7th Cir. 2015); *McClellon v. Thermo King Corp.*, No. 1:11-CV-1337, 2013 WL 6571946, at *9 (S.D. Ind. Dec. 13, 2013).

Plaintiff has no expert testimony demonstrating that the Leatt Brace deviated from its intended design. Thus, in order for the jury to determine whether the Leatt Brace deviated from its intended design, the jury must first understand how the Leatt Brace was intended to function under the specific circumstances involved. However, the physics and engineering of how a motorsport neck brace is designed to function are matters beyond the understanding of a lay person.

Plaintiff suggests that the fact finder must "simply consider whether . . . the Leatt-Brace complies with the design outlined in Defendant's promotional and research materials." (ECF 83, p. 13). Plaintiff cites five statements from the White Paper on the GPX Leatt Brace, asserting that the statements "account[] for potential *thoracic injuries* similar to that which [Plaintiff] suffered." (ECF 83, p.16) (emphasis added). However, the cited materials do not address potential thoracic spinal injuries but rather potential cervical spinal injuries. The Court considers each citation to the White Paper in turn.

First, Plaintiff notes that the White Paper, which Plaintiff identifies as Defendant's "promotional materials," "claim[s] the objective of the Leatt-Brace is to 'prevent/limit catastrophic injury.'" (ECF 83, p. 14 (citing ECF 83-3, p. 2 (White Paper, p. 1))). The Leatt Brace is designed to protect the cervical spine. If Plaintiff had severely injured his leg in the crash, requiring amputation of the leg, the injury would be a catastrophic injury, but it would not be the type of catastrophic injury the Leatt Brace was designed to protect against and would not be a basis for finding a defect. Likewise, Plaintiff's catastrophic thoracic injury is not the type of catastrophic injury the Leatt Brace is designed to protect against.

Second, Plaintiff asserts that the "Leatt-Brace was designed 'to reduce the incidence and severity' of *spinal* trauma by limiting the range of motion of the neck." (ECF 83, p. 14) (citing Def.

Resp. to Inter. No. 12)) (emphasis added). However, as noted above in footnote 3, this is a misstatement of Defendant's interrogatory response, which provides that the purpose of the Leatt Brace "is to reduce neck forces in various combinations and at various times during a crash" with the "aim [of reducing] the incidence and severity of *cervical spine* trauma, especially in situations involving an unrestrained human torso." *Id*. p. 12 (Def. Resp. To Inter. No. 12) (emphasis added). Plaintiff did not suffer a cervical spine trauma.

Third, Plaintiff notes that "the Leatt-Brace was intended to limit 'extreme ranges of movement' while allowing 'sufficient freedom of movement' such that the rider maintains the 'ability to move out of the way of the impact force.'" (ECF 83, p. 14 (quoting ECF 83-3, pp. 3-6 (White Paper, pp. 44-47))). While this a correct statement of the White Paper, Plaintiff identifies no evidence that the Leatt Brace did not provide sufficient freedom of movement while limiting extreme ranges of movement.

Fourth, Plaintiff asserts that, in the White Paper, Defendant

acknowledged that the Leatt-Brace was designed with the intention to prevent the rider's helmet (a motorcross-required piece of riding equipment) to project over the edges of the Leatt-Brace, because such projection could cause a "fulcrum effect," wherein the edge of the helmet pivots around contact with the Leatt-Brace and can result in *devastating injury to the rider*.

(ECF 83, p. 15 (citing ECF 83-3, p. 6 (White Paper, p. 47))) (emphasis added). However, the White Paper explains the specific type of devastating injury this design is intended to prevent:

Another important design consideration ensures that the device has the correct size and shape to prevent helmet projection over its edges. An incorrect size or shape of the upper surface of the brace can result in a "fulcrum effect". This is where the helmet projects over the outer edge of the device and pivots around the contact point, *causing a potentially devastating bending moment or torque on the neck of the rider*.

16

(ECF 83-3, p. 6 (White Paper, p. 47)) (emphasis added). Plaintiff has neither alleged nor offered evidence that his accident or injury was caused by his helmet pivoting due to contact with the edge of the Leatt Brace. Plaintiff does not allege or offer evidence of an injury caused by "bending moment or torque on the neck."

Fifth, Plaintiff states in his brief that the White Paper and Dr. Bodnar "purport that the thoracic strut on the Leatt-Brace was intended to break off on impact *to prevent fractures to the thoracic vertebrae*." (ECF 83, p. 15 (citing ECF 83-3, p. 8 (White Paper, p. 54); ECF 83-4, p. 11 (Bodnar Dep., p. 68:5-10)). However, as noted above in footnote 5, neither the White Paper nor Dr. Bodnar's deposition testimony says the thoracic strut is designed to break off "to prevent fractures to the thoracic vertebrae." The White Paper provides:

> The thoracic member and the strut of the Moto GPX were designed to prevent the upper platform of the Moto GPX from rotating when helmet strike forces are present, and to prevent the brace from rotating around the thorax. The carbon fiber strut was engineered with specific tolerances to ensure failure during extreme helmet impact events. The strut is designed to break at relatively low loads compared to high forces needed to fracture a thoracic vertebra.

(ECF 83-3, p. 8 (White Paper, p. 54)). Dr. Bodnar testified that Plaintiff's GPX Leatt Brace had thoracic struts and that the struts are designed to break off under certain circumstances. *See* (ECF 83-4, pp. 10-11 (Bodnar Dep. pp. 67:2-17, 23-25; 68:5-10)). Moreover, Plaintiff has not designated any evidence that his thoracic injury was caused by an external force from the thoracic strut. And, such an analysis would require expert testimony as it is beyond the understanding of a lay person to understand the physics and biomechanics involved.

None of these citations to the White Paper or Dr. Bodnar's deposition supports an allegation that the Leatt Brace was not manufactured according to its design.[8] Plaintiff references *Cansler v. Mills*, 765 N.E.2d 698, 706 (Ind. Ct. App. 2002), disapproved of on other grounds by *Schultz v. Ford Motor Co.*, 857 N.E.2d 977 (2006), a case in which the court found that defect could be proved without expert testimony based on circumstantial evidence within the understanding of the jury "that would constitute a basis for a legal inference and not mere speculation." The circumstantial evidence in that case was testimony and specifically designated portions of the product manual that supported the claim of defect. *See id*. In this case, without expert testimony and without relevant circumstantial evidence within the understanding of the jury, the jury could only speculate as to whether the circumstantial evidence from Plaintiff's accident, such as the extent of Plaintiff's injuries, can support a finding that the Leatt Brace departed from its intended design.

Thus, Plaintiff cannot prevail on a theory of manufacturing defect in the absence of expert testimony, and the Court grants summary judgment in favor of Defendant on this claim.

2.    *Design Defect*

To demonstrate a design defect under Indiana law a plaintiff must show that the defendant "failed to exercise reasonable care under the circumstances in designing the product." Ind. Code § 34-20-2-2; *see also Lapsley v. Xtek, Inc.*, 689 F.3d 802 (7th Cir. 2012); *TRW Vehicle Safety Sys., Inc. v. Moore*, 936 N.E.2d 201, 209 (Ind. 2010). Plaintiff argues in the introduction to this section of his brief that expert testimony is unnecessary to prove design defect because the fact finder can consider whether "a neck brace that limits a rider's field of vision and the range of motion of the neck creates

---

[8] In its reply brief, Defendant references headings throughout the White Paper as well as the qualifications of its authors. (ECF 88, p.9). However, Defendant did not attach a complete copy of the White Paper as an exhibit to its reply brief or identify a website where the White Paper can be accessed. As noted in footnote 4 above, Plaintiff attached only those pages of the White Paper cited in his response brief.

an unreasonably dangerous condition for motocross riders by negating a rider's ability to tuck the head and avoid direct forceful impact." (ECF 83, p. 14).

First, despite this opening statement, Plaintiff has not argued or offered evidence that his accident and/or injuries were because the Leatt Brace limited his field of vision.

Second, although his brief asserts that the Leatt Brace "negate[s] a rider's ability to tuck the head and avoid direct forceful impact," (ECF 83, p. 14), and "prevented [Plaintiffs'] ability to move his head out of the way of the impact force," *id*. at 16, Plaintiff does not make this allegation in the Amended Complaint. And, Plaintiff offers no evidence, including his own testimony, that the Leatt Brace prevented him from tucking his head during his accident. Plaintiff's response brief asserts:

> When he fell from his bike, Mr. Lyons "tried to tuck [his] head" and roll into an Army roll but "wasn't able to" *because his helmet got caught in the Leatt-Brace*. (Lyons Depo., 173:17-25; 174:11-16; 177:5-7).

(ECF 83, p. 15) (emphasis added). The italicized portion of the quotation from his brief is not found in the evidence identified by Plaintiff, all of which is quoted in its entirety in the Material Facts section above. *See supra* Material Facts (quoting ECF 83-5, pp. 33, 34, 35 (Pl. Dep., pp. 173:17-25; 174:11-16; 177:5-7)). Nowhere in those excerpts or the surrounding testimony does Plaintiff mention the neck brace nor does he testify that his helmet got caught in the neck brace or that he was not able to do an army roll because of the helmet getting caught in the brace. *See* (ECF 83-5, pp. 33, 34, 35 (Pl. Dep., pp. 173:17-25; 174:11-16; 177:5-7)). Rather, Plaintiff's testimony is a constatation that he was unable to do a tuck and roll.

Similarly, Plaintiff's brief also states:

> Mr. Lyons testified in his deposition that, when in "attack mode," his helmet would come into contact with the Leatt-Brace. (Lyons. Depo., 194:5-25; 195:1-4.) Mr. Lyons further testified that this contact occurred at the time of his injury-producing fall. (Lyons Depo., 173:17-25; 174:11-16; 177:5-7.)

19

(ECF 83, p. 15). As to the first sentence, the cited portions of Plaintiff's deposition are included in the Material Facts above in this Opinion. That testimony provides that the back of the helmet came in contact with the back of the brace when Plaintiff assumed a certain posture on the bike; there is no reference to the front of the helmet contacting the front of the brace or the brace preventing him from doing a tuck and roll. As to the second sentence, the three cited portions of Plaintiff's deposition testimony are the same three excerpts addressed in the previous paragraph of this Opinion; again, those three excerpts and the surrounding testimony do not reference a brace or the Leatt Brace. Those same pages do not contain testimony that Plaintiff's helmet contacted the Leatt Brace at the time of his fall. *See* (ECF 83-5, pp. 33, 34, 35 (Pl. Dep., pp. 173:17-25; 174:11-16; 177:5-7)).

And, in his argument, Plaintiff asserts that he "testified that the Leatt-Brace . . . prevented movement to avoid impact by making it impossible for him to tuck his head and perform an Army roll while coming to the ground after falling from his bike." (ECF 83, p. 16 (citing 83-5, pp. 24, 40, 41, 33, 34, 35 (Pl. Dep., pp. 143:1-10; 194:5-25; 195:1-4; 173:17-25; 174:11-16; 177:5-7))). Again, Plaintiff did not testify in these pages that the Leatt Brace prevented him from being able to do a tuck and roll or that his helmet came in contact with the brace during his fall.

"'[T]o allow a plaintiff to establish the existence of a design defect by his mere assertion is ludicrous.'" *McClellon v. Thermo King Corp.*, No. 1:11-CV-1337, 2013 WL 6571946, at *10 (S.D. Ind. Dec. 13, 2013) (quoting *Whitted*, 58 F.3d at 1206 (citing *Bishop v. Firestone Tire & Rubber Co.*, 814 F.2d 437 (7th Cir. 1987))). Plaintiff has not offered expert or circumstantial evidence that could establish a design defect. Even if Plaintiff had testified that the Leatt Brace prevented him from performing a tuck and roll, to make a determination regarding design defect in the absence of

expert testimony, the jury would need the requisite knowledge of physics and human anatomy to understand whether the Leatt Brace plays any role in causing a rider's injuries in an accident like Plaintiff's. Lay jurors lack this knowledge as well as the knowledge to understand what, if anything, could be done to make the Leatt Brace safer. Plaintiff is correct that some design defect cases to not require expert testimony because they involve easily understood design flaws. *See, e.g.*, *Hargis v. Wellspeak Enters.*, No. 1:08-CV-339, 2012 WL 3144962 (S.D. Ind. Aug. 1, 2012). This is not one of them. The design of motocross safety gear such as the Leatt Brace involves complicated applications of engineering and biomechanics that are beyond the understanding of a lay person, and expert testimony is required. The Court grants summary judgment in favor of Defendant on Plaintiff's design defect claim.

*3.      Failure to Warn*

"[T]he duty to warn is twofold: 1) to provide adequate instructions for safe use, and 2) to provide a warning as to dangers inherent in improper use. *Cook*, 913 N.E.2d 311 (citing *Rushford*, 868 N.E.2d at 810). "A manufacturer has a duty to warn with respect to latent dangerous characteristics of the product, even though there is no 'defect' in the product itself." *Nat. Gas Odorizing, Inc.*, 685 N.E.2d at 161; *see Weigle*, 729 F.3d at 734 ("Nothing in the IPLA indicates that the lack of a defect under § 34-20-4-2 precludes a finding of a defect under § 34-20-4-1). Whether a duty to warn exists is generally a question of law for the courts. *Nat. Gas Odorizing, Inc.*, 685 N.E.2d at 161.

Plaintiff argues that Defendant had a "duty to warn him of the latent dangers inherent in the Leatt-Brace irrespective of whether the brace was defective." (ECF 83, p. 18 (citing *Natural Gas Odorizing, Inc.*, 685 N.E.2d at 161)). Specifically, Plaintiff asserts that Defendant failed to

adequately warn motocross riders that the limited range of motion inherent in the design of the Leatt Brace could result in serious thoracic injury even with proper use. (ECF 83, p. 18-19). Thus, Plaintiff's failure to warn argument is necessarily based on a finding that the limitation on range of motion inherent in the Leatt Brace can result in "serious thoracic injury," which is the very issue of causation in this case.

In support, Plaintiff cites the reports of his experts. *See* (ECF 83, p. 19 (citing Kress Report, ¶¶ 1-4 and Hughes Report, pp. 104). But their opinions have been excluded by the Court. Plaintiff also cites his own deposition testimony, but again, as discussed in the previous sections, the testimony is not related to the mechanism of his injury on April 13, 2014. *See* (ECF 83, p. 19 (citing ECF 83-5, pp. (Pl. Dep. pp. 144:7-19, 192:2-6))). As addressed in the next section, Plaintiff cannot prove causation in this case without expert testimony. Thus, Plaintiff has no evidence of a latent danger in the brace, even with proper use, that requires a warning. The Court grants summary judgment in favor of Defendant on Plaintiff's failure to warn claim.

### 4.   *Causation*

Finally, and separate from the issue of proving defect, all of Plaintiff's IPLA claims fail because he has no admissible opinion testimony on causation. Under any of the three theories of defect under the IPLA, Plaintiff must prove that the product's defective condition proximately caused his injuries. *See Piltch*, 778 F.3d at 663 (citing *Rushford*, 868 N.E.2d at 810). As with defect, expert testimony is required to establish causation if the issue is outside the understanding of a lay person. *Id.* (citing *Daub*, 629 N.E.2d at 878).

Plaintiff's experts have been excluded. The cited portions of Plaintiff's deposition testimony do not state that the Leatt Brace prevented him from being able to "tuck and roll" to soften his

landing. No one witnessed this accident. Even if Plaintiff had testified that he could not perform a tuck and roll because his helmet contacted the Leatt Brace, lay jurors do not have the requisite knowledge of human anatomy and physics to determine whether Plaintiff's injuries were the inevitable result of an unavoidable head-first impact at high speed or whether they were caused by the Leatt Brace. While jurors might be familiar with the basic purpose of wearing neck protection, they are unfamiliar with the ergonomics, biomechanics, kinematics, and physics at play in Plaintiff's accident. Relevant factual questions may include, given the speed at which Plaintiff was traveling, the distance he traveled, and the angle at which he was launched from the bike, would Plaintiff have had time to perform a tuck and roll? How much was the range of motion of the helmeted head reduced by the Leatt Brace, and to what extent did that limit in range of motion affect the ability to tuck and roll? If Plaintiff had been able to perform a tuck and roll but landed on his shoulders instead of his head, would the axial load on Plaintiff's thoracic spine have been decreased? To what extent? If Plaintiff would not have been able to perform a tuck and roll with or without the brace, would he have suffered a cervical spine injury?

As with the design defect, lay jurors could only speculate as to whether Plaintiff would have sustained the same injuries, less serious injuries, or more serious injuries if he had not been wearing the Leatt Brace. Plaintiff has not identified any circumstantial evidence within the understanding of a lay person that is sufficient "to go beyond speculation and create a legal inference as to proximate cause." *Piltch*, 778 F.3d at 631, 633-34. The Court grants summary judgment in favor of Defendant on all of Plaintiff's claims.

**CONCLUSION**

Based on the foregoing, the Court hereby **GRANTS** the Motion for Summary Judgment [DE 62]. As a result, the Court **DENIES as moot** Defendant's Motion in Limine to Exclude Other Accidents and Reports [DE 50], Defendant's Motion in Limine Re Dr. Leatt's Medical Billings [DE 52], Plaintiff's Motion to Exclude Cornell de Jongh [DE 54], Plaintiff's Motion to Exclude Dr. Mitchell Garber [DE 60], and Plaintiff's Motion to Exclude Eric Knox [DE 61].

The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Defendant Leatt Corporation and against Plaintiff Brock C. Lyons.

SO ORDERED this 14th day of September, 2017.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT